[Civ. No. 15174. Fourth Dist., Div. Two. Dec. 16, 1975.]

BECKMAN INSTRUMENTS, INC., Plaintiff and Appellant, v.
COUNTY OF ORANGE et al., Defendants and Respondents.

768

## COUNSEL

Ronald Steelman for Plaintiff and Appellant.

Adrian Kuyper, County Counsel, and Laurence M. Watson, Deputy County Counsel, for Defendants and Respondents.

## OPINION

**TAMURA, J.**—Plaintiff appeals from an adverse judgment in its tax refund action against the County of Orange.[1] The taxes sought to be recovered resulted from (1) escape assessments for the years 1966-1967 through 1969-1970 and (2) the 1971-1972 assessments.

The underlying controversy stems from the manner in which plaintiff reported costs of its inventory in its annual business property statement filed with the county assessor. The case involves complex accounting and valuation concepts but the legal issues on appeal are rather narrow and

---

[1] The Cities of Fullerton, Buena Park and La Habra for and on whose behalf the county collects taxes were also named as defendants. However, we shall refer to the action as being against the county only.

The complaint sought recovery of $85,030.17 in taxes and $50,244.45 interest.

specific. A preliminary statement of the facts and events which led to the instant action will be helpful in focusing upon those issues.

Plaintiff, a California corporation with its principal place of business in the City of Fullerton, County of Orange, is engaged in the manufacture and sale of various types of precision instruments for scientific, industrial and medical purposes. Its business is organized and conducted along multidivisional lines.

During each of the tax years in question, plaintiff received from the county assessor business property statement forms together with written instructions for their preparation and filing. The instructions required the taxpayer to provide specific cost information in reporting inventory.

Plaintiff's books and records were maintained under a standard cost accounting system. Under that system plaintiff carried certain expenses in what is known as variance accounts. If those expenses had been recorded as costs, it would have resulted in either an increase or reduction in the cost of its inventory. Plaintiff's accounting records also contained amounts shown as "interdivisional profits." Those amounts were shown on the company's books pursuant to its business policy of crediting "profits" to the transferring division on interdivisional transfers of certain inventory items.

In its business property statements for the years 1966-1967 through 1969-1970, plaintiff reported inventory costs using only the standard costs shown on its books and records. It failed to report amounts carried in the variance accounts or amounts shown on its records as "interdivisional profits" and it excluded inventory which, in its opinion, was tax exempt on the lien date because it had been prepared and was being held for foreign shipment.

In 1970 the assessor, as required by Revenue and Taxation Code section 469,[2] audited plaintiff's books and records for the tax years

---

[2]Unless otherwise indicated, all section references in this opinion are to the Revenue and Taxation Code.

Section 469 provides:

"In any case in which locally assessable business tangible personal property owned, claimed, possessed or controlled by a taxpayer engaged in a profession, trade, or business has a full value of fifty thousand dollars ($50,000) or more, the assessor shall audit the books and records of such profession, trade, or business before October 6, 1971, and at least once each four years thereafter. If the board determines the value of the property

1966-1967 through 1969-1970. As a result of the audit, the assessor determined that for each of those years plaintiff failed to supply all of the cost information for reporting inventory as required by the assessor's instructions in that it failed to disclose: (1) Expenses carried in the variance accounts; (2) amounts shown on its records as "interdivisional profits"; (3) costs of inventory claimed to be exempt; and (4) costs of certain inventory not pertinent to this appeal. The assessor concluded that failure to include the foregoing information in the property statement resulted in underassessment of plaintiffs property.[3] Accordingly in July 1971, the assessor made an escape assessment for each of the tax years 1966-1967 through 1969-1970 and plaintiff was billed for additional taxes together with interest computed pursuant to section 506.[4]

In assessing plaintiff's inventory for the tax year 1971-1972 the assessor took into consideration amounts carried in plaintiff's variance accounts, amounts shown as "interdivisional profits," and cost of inventory claimed by plaintiff to be tax exempt.

Plaintiff paid the escape assessments (including interest) and the 1971-1972 taxes under protest. It then filed applications with the county assessment appeals board (appeals board) for reduction in the escape assessments and the 1971-1972 assessment.[5]

---

pursuant to Chapter 2 (commencing with Section 1815) of Part 3 of this division, such determination may be deemed an audit by the assessor for purposes of this section.

"Equalization of the property by a county board of equalization or assessment appeals board pursuant to Chapter 1 (commencing with Section 1601) or Chapter 1.5 (commencing with Section 1750) of Part 3 of this division shall not preclude a subsequent audit and shall not preclude the assessor from levying an escape assessment in appropriate instances, but shall preclude an escape assessment being levied on that portion of any such assessment which was the subject of any such equalization hearing."

[3] The assessor determined that the full cash value of property which had escaped assessment for the four tax years totaled $12,177,520.

[4] Section 506 provides:

"The tax rate applicable to any assessment made pursuant to this article shall be the tax rate to which the property would have been subject if it appeared upon the roll in the year when it should have been lawfully assessed. To the tax there shall be added interest at the rate of one-half of 1 percent per month from the date or dates the taxes would have become delinquent if they had been timely assessed to the date the additional assessment is added to the assessment roll."

[5] The application stated they were also intended as claims for refund pursuant to section 5097.

Section 5097 provides in pertinent part:

"No order for a refund under this article shall be made except on a claim:

"(a) Verified by the person who paid the tax, his guardian, executor, or administrator.

"(b) Filed within four years after making of the payment sought to be refunded or

Plaintiff's attack upon the assessments at the appeals board hearing was confined to the following actions of the assessor: (1) Consideration of "interdivisional profits" in making the escape assessments and the 1971-1972 assessments; (2) inclusion of inventory items claimed by plaintiff to be exports; (3) addition of interest to taxes levied as escape assessments; and (4) denial of the business inventory exemption provided by section 219 with respect to the escape assessment for the tax year 1969-1970. Plaintiff did not seek a reduction in the assessor's value conclusion resulting from his consideration of the variance accounts.

Following hearing on the application, the appeals board determined that "interdivisional profits" should have been excluded in making the escape assessments. Otherwise plaintiff's objections and protests to the escape assessments and to the 1971-1972 assesements were rejected. Following the board's decision, the county refunded that portion of the taxes, together with applicable interest, resulting from the value reduction required by the appeals board's decision.

Plaintiff thereafter filed the present action for refund of taxes alleging as grounds for recovery of the taxes and interest substantially the same grounds advanced before the appeals board. The cause was tried and submitted on the record of the proceedings before the appeals board, additional expert testimony and documentary evidence introduced by plaintiff at trial, and written and oral arguments of counsel. The court ruled in favor of the county on all issues; judgment was entered in favor of the county; and this appeal ensued.

The pertinent determinations of the court below were as follows: (1) The escape assessments are to be deemed to have been made under the authority of section 531.3 and accordingly the interest prescribed by section 506 was properly added to the amount of the taxes; (2) plaintiff was not entitled to the business inventory exemption provided by section 219 with respect to the inventory assessed as escape property for the tax year 1969-1970; (3) the amounts shown on plaintiff's books as "interdivi-

within one year after the mailing of notice as prescribed in Section 2635, whichever is later.

"An application for a reduction in an assessment filed pursuant to Section 1607 or Section 1760 shall also constitute a sufficient claim for refund under this section if the applicant states in the application that the application is intended to constitute a claim for refund. If the applicant does not so state, he may thereafter and within the period provided in subdivision (b) file a separate claim for refund of taxes extended on the assessment which applicant applied to have reduced pursuant to Section 1607 or Section 1760."

sional profits" were properly considered by the assessor in making the 1971-1972 assessment; and (4) the items of inventory which plaintiff claimed to be exports were not in the stream of foreign commerce on the respective lien dates and were therefore not exempt from ad valorem taxes.

This appeal presents the following limited legal issues: (1) Whether interest should have been added to the taxes collected as a result of the levies made as escape assessments; (2) whether plaintiff was entitled to the business inventory exemption with respect to the inventory assessed as escape property for the tax year 1969-1970; and (3) whether plaintiff was entitled to a refund of that portion of the 1971-1972 taxes attributable to "interdivisional profits." For the reasons to be stated below, we have concluded that the trial court properly resolved all of the foregoing issues in favor of the county except as to that portion of the 1971-1972 taxes attributable to some of the "interdivisional profits."

I

### INTEREST

The interest issue pertains only to that portion of the taxes attributable to values assigned to the inventory escaping assessment by reason of the nondisclosure of the variance accounts. Taxes and applicable interest attributable to "interdivisional profits" for each of the escaped years have been refunded by the county and the taxes and applicable interest attributable to inventory claimed to be exports on the lien date and hence tax exempt are not contested on this appeal.

The statutory provision pertinent to the interest issue is section 531.3. That section provides:

"If the assessor requires an assessee to describe personal property in such detail as shows the cost thereof but the assessee omits to report the cost of the property accurately, notwithstanding that this information is available to the assessee, to the extent that this omission on the part of the assessee causes the assessor not to assess the property or to assess it at a lower valuation than he would enter upon the roll were the cost reported to him accurately, that portion of the property as to which the cost is unreported, in whole or in part, shall be assessed as required by law. If the omission is willful or fraudulent, the penalty and interest provided in Sections 504 and 506 shall be added to the additional

assessment; otherwise only the interest provided in Section 506 shall be so added."

The appeals board, by implication, and the trial court, by express findings, determined that the escape assessments met all of the conditions specified in section 531.3 and that interest computed in accordance with section 506 was therefore properly added to the taxes. Based upon the record of the proceedings before the appeals board and the supplemental evidence introduced at trial, the court found, inter alia: (1) The written instructions accompanying the property statement forms which the assessor sent to plaintiff on each of the tax years in question required plaintiff to describe its inventory in such detail "as to show 100 percent of the current actual cost"; (2) in reporting inventory costs on the property statement, plaintiff reported only standard costs as shown on its books and records; (3) plaintiff did not report expenses carried in its variance accounts; (4) the failure to report amounts carried in the variance accounts resulted in a failure to report "100 percent of the current actual costs of inventory" as required by the written instructions; (5) the failure to report cost details accurately as required by the instructions caused the assessor not to assess property or to assess it at a lower valuation than he would have entered on the assessment roll had they been accurately reported; (6) although the tax bills for the escape assessments bore the notation that they were made pursuant to sections 501[6] and 506, all of the conditions specified by section 531.3 were present and plaintiff was not misled or prejudiced by the notation. Based upon the foregoing findings, the court concluded that interest was properly added to the taxes levied as a result of the escape assessments.

Although plaintiff avoids a frontal attack upon the trial court's findings, its entire argument pertaining to the interest issue is addressed to the sufficiency of the evidence to support the court's findings.

■ Where an attack is upon the sufficiency of the evidence to support findings of a trier of fact, it is not the function of a reviewing court to reweigh the evidence, judge credibility of witnesses, or to determine the weight to be given expert testimony. Those are exclusively functions of the trier of fact. As has been so often said, our function as a reviewing

---

[6]Section 501 provides:

"If after written request by the assessor, any person fails to comply with any provision of law for furnishing information required by Sections 441 and 470, the assessor, based upon information in his possession, shall estimate the value of the property and, based upon this estimate, promptly assess the property."

court begins and ends with the determination whether there is any substantial evidence, contradicted or uncontradicted, which would support the trial court's findings. (*Stevens* v. *Parke, Davis & Co.,* 9 Cal.3d 51, 63-64 [107 Cal.Rptr. 45, 507 P.2d 653]; *Estate of Bristol,* 23 Cal.2d 221, 223 [143 P.2d 689]; *Crawford* v. *Southern Pacific Co.,* 3 Cal.2d 427, 429 [45 P.2d 183].) ▮ "A reviewing court must start with the presumption that the record contains evidence to sustain every material finding of fact; one contending that the evidence does not support a finding must demonstrate that there is no substantial evidence to support it; he must set forth in his brief *all* the material evidence bearing upon that issue and not merely evidence favorable to him; failure to so state the evidence may be deemed a waiver of the claimed error. (*Foreman & Clark Corp.* v. *Fallon,* 3 Cal.3d 875, 881-882 [92 Cal.Rptr. 162, 479 P.2d 362], and cases there cited.)

▮ Plaintiff's brief merely directs our attention to testimony of its experts favorable to the position it espouses; it neglects to set forth all of the evidence, unfavorable as well as favorable to plaintiff. We have, nevertheless, reviewed the entire record and are satisfied that there is substantial evidence to support the trial court's findings.

Although plaintiff refers to opinions of its experts that the assessor's written instructions only called for "book costs" where the taxpayer maintains a perpetual inventory, the instructions are replete with language indicating that all property was to be reported at "100 percent actual cost" and that inventory on hand was to be reported at "100 percent of current actual costs." The court's findings in this respect are amply supported by the record.

Further, relying on the testimony of its experts, plaintiff contends that the standard cost accounting system it employs presents an accurate reflection of actual costs. However, the record reveals that all of the experts, those appearing before the appeals board as well as plaintiff's experts at trial, agreed that there is a distinction between "standard costs" and "actual costs." Plaintiff's expert testified that theoretically standard costs together with amounts carried in the variance accounts would reflect actual costs. It is true the expert added that in his opinion this would not be a satisfactory method of determining actual costs, quoting in support of his opinion excerpts from the Handbook of Modern Accounting, edited by Sidney Davidson (1970) McGraw Hill, Inc., chapter 39, pages 30-31. However, the quoted treatise, though critical of the practice, acknowledges the fact that "some writers

recommend that monthly variances be allocated to the inventory accounts to which they pertain." (Ch. 39, p. 30.) The treatise also recognizes the difference between the concept of standard costs and actual costs. It defines standard costs as "objectively determined costs to be used as a basis of comparison with actual costs" (ch. 39, p. 2), and as expressions of costs "as they *ought to be* or as they *will be* if control is maintained." (Italics supplied; ch. 39, p. 3.) Under a section entitled "Accounting and Reporting for Standard Costs," the treatise recognizes the relationship of variance accounts to actual costs. It states:

"Although actual costs may be kept in one set of accounts and standards maintained on a statistical basis, modern practice unites actual and standard costs in the same system of accounts to achieve maximum benefits from standard costing. A standard cost system will ultimately come to the point where it will show in one or more accounts:

Standard Cost Account

Actual Standard

The difference between the two sides of the account would be termed a 'variance.' " (Ch. 39, p. 5.)

We conclude that there was substantial evidence before the court to support its findings and conclusions that plaintiff failed to report "actual costs" of its inventory accurately as required by the assessor's instructions and that the failure to do so caused the assessor to value plaintiff's inventory during the escaped years at a lower valuation than he would have determined had accurate cost information been provided. The court's conclusions that the conditions of section 531.3 were fully met and that interest computed pursuant to section 506 was therefore properly added are amply supported by the evidence and the findings.

Plaintiff's contention that the escape assessments were simply the result of reappraisals by the assessor of property previously assessed and therefore not valid escape assessments is without merit.[7] Whatever vitality there may still be in the rule expressed in *Clunie* v. *Siebe*, 112 Cal. 593, 596 [44 P. 1064], and *Stafford* v. *Riverside County*, 155

---

[7]Plaintiff's argument that the escape assessments were statutorily unauthorized is difficult to reconcile with its failure to seek refund of all taxes levied as escape assessments. Plaintiff for some unexplained reason chose not to contest the assessor's value conclusions except in the specific respects urged before the appeals board.

Cal.App.2d 474, 477-478 [318 P.2d 172], that escape assessments may be made only where there has been no previous assessment (see *Bauer-Schweitzer Malting Co.* v. *City and County of San Francisco,* 8 Cal.3d 942, 948 [106 Cal.Rptr. 643, 506 P.2d 1019]; *Hewlett-Packard Co.* v. *County of Santa Clara,* 50 Cal.App.3d 74, 81 [123 Cal.Rptr. 195]), it is clearly subject to the provisions of section 531.3 expressly authorizing escape assessments where property has been underassessed because the taxpayer failed to report accurately the cost of his property. (*Bauer-Schweitzer Malting Co.* v. *City and County of San Francisco, supra,* 8 Cal.3d 942, 946; *Ex-Cell-O Corp.* v. *County of Alameda,* 32 Cal.App.3d 135, 140 [107 Cal.Rptr. 839].)

Since the escape assessments were properly deemed to have been made under section 531.3 and since there was no claim by the assessor that plaintiff's inaccurate reporting was willful or fraudulent, interest was properly computed in accordance with section 506.

## II

### Business Inventory Exemption

Plaintiff contends that the trial court erred in concluding that plaintiff was not entitled to the business inventory exemption allowed by section 219 with respect to the escape assessment for the tax years 1969-1970.[8]

Plaintiff's contention in this respect is premised entirely on the theory that the escape assessments of inventory were not made pursuant to section 531.3. Our discussion of the interest issue in the previous section of this opinion is dispositive of that contention. At the time here pertinent section 219 contained the following provision: "The exemption

[8]In July 1971 when the escape assessments were made, section 219 provided in pertinent part:

"Business inventories shall be assessed for taxation at the same ratio of assessed to full cash value as the ratio specified in Section 401. After such property has been so assessed, 30 percent of the assessed value of such property shall be exempt from taxation for the 1970-1971 and the 1971-1972 fiscal years, and such exemption shall be indicated on the assessment roll. After such property has been so assessed for the lien date in 1972 and on each lien date thereafter, 15 percent of the assessed value of such property shall be exempt from taxation, and such exemption shall be indicated on the assessment roll. The county assessor shall notify the auditor of the total assessed value of the exempt property within each city, district and revenue district wholly or partially within the county. The exemption provided for in this section shall not apply to business inventories assessed as escaped property under the provisions of Sections 531.3, 531.4 or 531.5. The board shall prescribe all procedures and forms required to carry this exemption into effect and to insure accurate data for reimbursement calculations." (Stats. 1970, ch. 298, p. 571.)

provided for in this section shall not apply to business inventories assessed as escaped property under the provisions of sections 531.3, 531.4 or 531.5."

## III

### Interdivisional Profits

 The "interdivisional profits" issue pertains only to the 1971-1972 assessment.[9] Plaintiff contends it is entitled to recover that portion of the 1971-1972 taxes attributable to the value placed on that year's inventory by reason of the inclusion of "interdivisional profits" as an element of cost.

The record of the proceedings before the appeals board shows that the "interdivisional profits" or "markups" reflected on plaintiff's books for the tax year 1971-1972 involved transfers of items from one division to another[10] either (1) to facilitate marketing or delivery to foreign or domestic customers or (2) for use by the receiving division in the manufacture of a different end product. The major portion of the items was of the first category. Only a relatively small portion, accounting for $10,405 of "interdivisional profits," involved transfers coming within the second category.

The assessor determined that the items for which "profits" or "markups" were shown in the company records were transferred for the purpose of taking advantage of "the specialized marketing or the fabricating skills of one division over another division," and that those were "the same reasons any manufacturing business would have for either procuring items from an outside vendor rather than for fabricating them internally, or selling an item to a middleman organization rather than marketing the items itself because it doesn't possess the required marketing skills." The assessor also referred to plaintiff's policy memorandum for recording "profits" or "markups" as a recognition by the

---

[9]The assessor did not seek judicial review of the appeals board's determination that the amounts shown as "interdivisional profits" should have been excluded by the assessor in determining costs of inventories for the purpose of making the escape assessments.

[10]The evidence received by the appeals board was in the form of direct oral testimony and prepared written "Summary of Petitioner's Testimony in Support of its Petition" and "Summary of Assessor's Rebuttal Testimony." The written summaries of testimony were received in evidence by stipulation of the parties.

taxpayer of trade level increases in value at the time of the various interdivisional transfers.[11]

Based upon the foregoing evidence, the appeals board rejected plaintiff's attack upon the 1971-1972 valuation of its inventory grounded on the inclusion of "interdivisional profits" in determining value. The trial court ruled that there was substantial evidence before the appeals board to support the assessor's determination that "interdivisional profits" reflected "trade level increase in value" and hence were properly taken into account in ascertaining fair market value of the inventory.

In assessing the validity of plaintiff's attack upon the trial court's resolution of the "interdivisional profits" issue, we must be cognizant of certain basic legal principles governing the scope of judicial review of decisions of local boards of equalization on questions of valuation. ▮ The duty of determining the value of property and the fairness of the assessment is conferred by law upon local boards of equalization; the taxpayer is not entitled to a trial de novo in the superior court to resolve conflicting factual issues as to the taxable value of property; the question before the superior court is whether there was substantial evidence before the board of equalization to support its determination. (*Bank of America* v. *Mundo,* 37 Cal.2d 1, 5 [229 P.2d 345]; *Hunt-Wesson Foods, Inc.* v. *County of Alameda,* 41 Cal.App.3d 163, 169 [116 Cal.Rptr. 160].) ▮ The board's decision on specific valuation methods, moreover, are judicially reviewable only for arbitrariness, abuse of discretion, or failure to follow statutory standards (*De Luz Homes, Inc.* v. *County of San Diego,* 45 Cal.2d 546, 564 [290 P.2d 544]; *Hunt-Wesson Foods, Inc.* v. *County of Alameda, supra,* 41 Cal.App.3d 163, 180; *County of Sacramento* v. *Assessment Appeals Bd. No. 2,* 32 Cal.App.3d 654, 661 [108 Cal.Rptr. 434]), and the taxpayer has the burden of showing the board that the assessor's methods were improper

---

[11]The portions of plaintiff's policy memorandum on "interdivisional profits" quoted by the assessor were as follows:

"1. In general, the buying division will never be required to pay a higher price than it would pay an outside vendor and a manufacturing division will never be required to accept a lower price than the price computed as prescribed in this procedure.

"2. In addition, the interdivision selling price of an item should never exceed the lowest price at which the same item is sold to a regular customer."

"Pricing Sales to Domestic Divisions:

"2. Sales to Domestic Division of Products for further processing

"a. Sales of manufactured parts and assemblies to other domestic divisions will be priced at the lower of:

"1) The manufacturing division's cost plus 25 percent.

"2) The outside vendor price quoted to the buying division."

and the resulting assessments unfair and inequitable (*Hunt-Wesson Foods, Inc.* v. *County of Alameda, supra,* 41 Cal.App.3d 163, 180). The scope of review for a reviewing court is the same as it was for the superior court. (See *Bixby* v. *Pierno,* 4 Cal.3d 130, 149 [93 Cal.Rptr. 234, 481 P.2d 242]; *Boreta Enterprises, Inc.* v. *Department of Alcoholic Beverage Control,* 2 Cal.3d 85, 94-95 [84 Cal.Rptr. 113, 465 P.2d 1]; *Merrill* v. *Department of Motor Vehicles,* 71 Cal.2d 907, 916 [80 Cal.Rptr. 89, 458 P.2d 33].)

Thus, the specific legal issue before us is whether the board's decision upholding the assessor's treatment of "interdivisional profits" or "markups" as trade level increases in value was arbitrary, unreasonable or violative of constitutional or statutory standards for the valuation of property for taxation.

Under our Constitution all taxable property must be assessed in proportion to its "fair market value" or "full cash value." (Cal. Const., art. XIII, § 1.) The statute defines "full cash value" or "fair market value" as "the amount of cash or its equivalent which property would bring if exposed for sale in the open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other and both with knowledge of all of the uses and purposes to which the property is adapted and for which it is capable of being used and of the enforceable restrictions upon those uses and purposes." (§ 110.)

The State Board of Equalization has promulgated a specific rule, rule 10, dealing with the concept of trade level value as it relates to the valuation of tangible personal property for ad valorem tax purposes. (Cal. Admin. Code, tit. 18, rule 10.) Rule 10 provides in pertinent part as follows:

"(a) In appraising tangible personal property, the assessor shall give recognition to the trade level at which the property is situated and to the principle that property normally increases in value as it progresses through production and distribution channels. Such property normally attains its maximum value as it reaches the consumer level. Accordingly, tangible personal property shall be valued by procedures that are consistent with the general policies set forth herein.

". . . . . . . . . . . . . . . . . .

"(c) Tangible personal property in the hands of a manufacturer who holds it for processing or for sale shall be valued at the amount for which

it would transfer to other manufacturers of like property. This value shall be estimated (1) by reference to the cost of the property in its condition on the lien date or (2) by reference to the cash price at which the manufacturer is expected to sell the property less costs yet to be incurred and experienced gross profits. When the cost approach is used, there shall be added to the cost of raw materials all other direct costs and manufacturing burden, including depreciation and property taxes, but excluding selling and general administrative costs. Unprocessed raw material cost is the cost of replacement on the lien date as evidenced by recent purchases by the assessee or other recent market transactions."

The assessor's application of the trade level value concept with respect to items transferred from one division to another to facilitate marketing or shipment to domestic or foreign customers is consistent with the constitutional and statutory requirement that all property be assessed in proportion to its "fair market value" and with the State Board of Equalization guidelines set forth in rule 10. The concept of trade level increase in value simply recognizes the fact, as plaintiff concedes, that property normally increases in market value as it progresses from goods in process to manufactured goods, to wholesale, to retail, or to some other definable intermediate level. The items transferred to the marketing or shipping division were finished goods ready to be sold or shipped to customers. Those items clearly attained a trade level justifying an increase in value by virtue of their marketability.

Plaintiff argues that even though the items were end products, they did not experience increase in value because they were only transferred from one division of the company to another division of the same company. To accept plaintiff's argument would mean that in appraising property for tax purposes the assessor would be precluded from considering the trade level value of finished goods transferred to and held by a sales division of a multidivisional organization such as plaintiff but would be entitled to apply the adjustment to finished goods transferred from a manufacturer to an unrelated sales entity, a consequence wholly inconsistent with the trade level value concept. The trade level principle simply recognizes the fact that as property flows through various stages from production to distribution, at certain intermediate levels the property attains a market value which includes the element of profit. The value increase does not turn upon change in possession or ownership but on the stage of production or distribution.

We conclude that with respect to items transferred from one division to another for the purpose of facilitating marketing or shipment to

customers, the assessor's treatment of "interdivisional profits" or "mark-ups" as trade level increases in value was neither an arbitrary nor unreasonable method of ascertaining fair market value or full cash value of such inventory.

■ As previously noted, however, some of the transfers for which "interdivisional profits" were recorded involved items used by the receiving division in the manufacture of a different end product. Those items consisted of electronic components manufactured "exclusively and solely" for the "Process Industrial Division" "for incorporation into its infrared CO and $CO_2$ instrumentations." "Interdivisional profits" of $10,405 were shown for those transfers.

In May 1971, after the lien date for the tax year 1971-1972, the State Board of Equalization added subdivision (f) to rule 10.[12] Plaintiff urges that although subdivision (f) was promulgated after the 1971-1972 tax year lien date, it may nevertheless be considered in determining the validity of the 1971-1972 assessment. Specifically, plaintiff relies on that portion of the subdivision which reads: "Component parts held at the manufacturing-processing level, however, shall not be considered to be at a higher level than that at which they are manufactured when they have been manufactured by a business entity specifically and exclusively for

"(1) incorporation by the entity in its finished product,

"(2) marketing as replacement parts for its finished product, or

"(3) both."

---

[12]Subdivision (f) reads:

"(f) When tangible personal property is in the hands of a person engaged in two or more of the functions of producer, manufacturer or processor, wholesaler, retailer, or consumer, the level of trade at which the property is held shall be determined by reference to its form, location, quantity, acquisition source, and probable purchasers or lessees. A person is operating at two or more levels when the property consists of raw materials, semi-manufactures, or finished goods which were acquired from sources within a business entity (other than component parts meeting the tests of the following sentence) and the property is held (1) for consumption by the business entity or (2) for processing and/or marketing in competition with similar products marketed by other business entities that have purchased like raw materials, semi-manufactures, or finished goods at the same stage of production from external sources. Component parts held at the manufacturing-processing level, however, shall not be considered to be at a higher

We agree with plaintiff that although subdivision (f) did not become effective until a few months after the 1971-1972 lien date, the additional guidelines for use of the trade level concept are apposite. The subdivision was added, not to reflect any constitutional or statutory change in the standard by which property should be valued for tax purposes, but to refine the guidelines for use of the trade level concept in the ascertainment of fair market value of property. The subdivision may therefore properly be considered in determining the reasonableness of the assessor's application of the trade level concept in the valuation of the inventory for the 1971-1972 tax year.

The uncontroverted evidence is that the electronic components for which an "interdivisional profit" of $10,405 was recorded by the company were component parts manufactured by plaintiff "specifically and exclusively" for incorporation into a product manufactured by it. They thus came squarely within the exception mentioned in subdivision (f) of rule 10. The exception recognizes the fact that component parts which are made exclusively for and to the specifications of the manufacturer for incorporation into a product made by it would normally not have an enhanced value based upon marketability.

We conclude that the 1971-1972 assessment should be reduced to the extent that "profits" on the interdivisional transfers of the component electronic parts were considered in determining value of the inventory for that year and that the taxes attributable to that factor should accordingly be refunded.

### Disposition

Judgment is reversed with directions to modify the findings and

---

level than that at which they are manufactured when they have been manufactured by a business entity specifically and exclusively for
"(1) incorporation by the entity in its finished product,
"(2) marketing as replacement parts for its finished product, or
"(3) both.
"When it is concluded that the person holding tangible personal property is operating at more than one trade level, property at the higher trade level or levels acquired from internal sources shall be valued (1) by estimating what the property, in its condition and location on the lien date, would have cost had it been acquired in an arm's-length transaction from an outside supplier, (2) by reference to the cash price at which the property could be sold in an arm's-length transaction to an outside customer less a reasonable gross profit, or (3), if held at the consumer level, in accordance with subdivision (e)."

conclusions to comport with this opinion and to enter judgment accordingly.

Gardner, P. J., and Kaufman, J., concurred.