Filed 11/20/14  Pacific Building Development v. Kensington-Fair Oaks Assocs. Joint Venture CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| PACIFIC BUILDING DEVELOPMENT INC., <br><br>       Plaintiff, Cross-defendant and Appellant, <br><br> v. <br><br> KENSINGTON-FAIR OAKS ASSOCIATES JOINT VENTURE, <br><br>       Defendant, Cross-complainant and Appellant. <br><br> TOPA INSURANCE COMPANY, <br><br>       Intervener and Respondent. | H038482 <br> (Santa Clara County <br> Super. Ct. No. CV 056857) |

Following a court trial, judgment was entered in favor of respondent Topa Insurance Company (Topa) in consolidated actions involving Topa's duty as excess liability insurer of a contractor's work on the property of appellant Kensington-Fair Oaks Associates Joint Venture (Kensington). Kensington contends that the court improperly reallocated the amount of a settlement between Kensington and the primary liability insurer, Lincoln General Insurance Company (Lincoln), to find that Lincoln's successive primary policies were not exhausted. We will affirm the judgment.

*Background*

In early March of 2005 Kensington entered into a contract with the insured, Pacific Building Development Inc. (Pacific), for the reconstruction and repair of structural defects in the 186-unit apartment complex Kensington owned in Sunnyvale. In December 2005 Pacific stopped work on the project, claiming payments due for work already performed. Pacific filed suit against Kensington on January 25, 2006, for breach of contract and for the value of goods and services provided, which it estimated to be $700,000. Kensington filed a cross-complaint against Pacific for negligence in Pacific's performance of the work, breach of contract for failing to perform and complete the work free of defects, and breach of a third-party contract between Pacific and its subcontractors. In September 2006 Pacific filed a separate cross-complaint for indemnity against several subcontractors, including Rojas Construction and its principal, Rudy Rojas (collectively, Rojas).[1] Rojas filed its own cross-complaint against Pacific for breach of contract in July 2008.

Pacific was insured by Lincoln during the period of the project. Between June 11, 2004 and June 11, 2005 the liability policy covered property damage up to a limit of $1 million (the 04-05 policy). A second Lincoln policy (the 05-06 policy) covered the period between June 11, 2005 and June 11, 2006. Pacific also held an excess policy issued by Topa covering the period from July 19, 2005 to June 11, 2006.

Lincoln also insured Rojas from January 22, 2005 to January 22, 2006, and from January 22, 2006 to January 22, 2007, each policy covering liability for property damage up to $500,000 for any one occurrence.

---

[1] Pacific filed a second, similar complaint against the subcontractors in April 2008.

According to the parties, Pacific's corporate status was suspended on August 1, 2008.[2] In August 2009, Pacific demanded $540,359 from Rojas to settle the case, conditioned on Kensington's agreement to settle for $1.5 million or less, "and that a global settlement can be reached."

In late October of 2009, Lincoln filed a complaint in intervention, representing the interests of Pacific as both plaintiff and cross-defendant. Lincoln alleged comparative fault as well as equitable and implied indemnity against Rojas and other subcontractors. On March 30, 2010, Lincoln's counsel, Daniel J. Smith, reported that Rojas (through Lincoln as its insurer) had offered to pay $350,000 and dismiss its claim against Pacific in exchange for Pacific's dismissal of its cross-complaint against Rojas. Sherry Kretzer, the Lincoln claims representative who had handled the Kensington-Pacific lawsuit, testified at trial that she had recommended accepting the $350,000 offer by Rojas.

On April 20, 2010, following mediation, Smith reported that Lincoln had offered to exhaust its Pacific policy for $1 million conditioned on Kensington's full release of Lincoln and its "covenant not to execute against [Pacific], its shareholders and officers." Lincoln would then assign its rights against the subcontractors to Kensington. Upon receiving the assignment, Kensington would dismiss Rojas and Rojas would dismiss its claim against Pacific. Smith added that "[t]he understanding between Kensington and Lincoln General regarding Rojas will not be contained in the agreement between Kensington and [Pacific]. The agreement will only state that [Pacific] is assigning its rights against Rojas to Kensington."[3]

---

[2] Neither party refers this court to documentary evidence from which we can take judicial notice of this fact. Kensington also does not provide the January 2010 order which it represents to be a grant of Kensington's motion to strike Pacific's complaint and answer to Kensington's cross-complaint.

[3] The trial court also admitted an April 13, 2010 entry on Lincoln's "Claims Task Management System," which stated, "Just spoke with Ed Ruberry—case settled for

3

Topa filed its own complaint in intervention on May 25, 2010. Topa informed the court that Lincoln and Pacific's subcontractors were engaged in settlement negotiations, and it noted its objection to Lincoln's proposal "in light of [Rojas's] liability exposure." In its complaint Topa alleged that if it were to be found liable for Kensington's damages, the named subcontractors were liable on the theories of equitable and implied indemnity and comparative fault.

On July 31, 2010, Kensington and Lincoln executed a settlement agreement "to formalize termination of [Lincoln's] involvement with respect to certain issues" in the Pacific action against Kensington. Lincoln agreed to pay $1 million under Pacific's 05-06 policy, and Lincoln represented that this payment would exhaust the limits of coverage for that policy. Lincoln also agreed to assign to Kensington all of its rights asserted against Rojas and other subcontractors. Finally, Kensington agreed to release Lincoln, along with Pacific "to the extent of the [settlement amount]," from all claims connected with the action or Lincoln's obligations under the agreement. Kensington, however, was "not releasing [Pacific] for any recovery in excess of the [settlement amount] and is not releasing any other insurer from obligations that are in excess or in addition to the one million dollars that exhausts the [Lincoln] insurance policy as recited herein." Kensington also expressly acknowledged the risk that there might be unanticipated claims connected with the litigation, and it waived any rights it had "in such unsuspected claims." Kensington further acknowledged its awareness of the Topa excess policy, and Lincoln expressed its understanding that Kensington would continue the litigation against Pacific to the extent that the Topa policy was available.

On August 17, 2010 Topa filed a separate action against Lincoln, seeking a declaration that its excess policy had not been triggered because neither of the primary

$1M with no payments on Rojas and no payment for atty fees. Excellent job by Ed at the mediation." Ruberry was the coverage counsel representing Lincoln at the mediation.

4

Lincoln policies had been exhausted. Topa then amended its earlier complaint in intervention to add a cause of action for declaratory relief against Kensington, again alleging that its excess policy had not been triggered because the two Lincoln policies had not yet been exhausted. Over Lincoln's objection, Topa successfully moved to consolidate its action against Lincoln with the original litigation between Pacific and Kensington. The Pacific-Kensington action was designated the lead case. Rojas by this time had obtained an order (over Topa's objection) determining that Kensington and Rojas had reached a good faith settlement. In that settlement Kensington agreed to dismiss its cross-complaint against Rojas "and the rights it was assigned by Lincoln General Insurance Company with prejudice in exchange for a waiver of costs."

On November 30, 2011, Topa obtained a default judgment against Lincoln.[4] In the judgment the court declared that the 04-05 Lincoln policy was applicable to the claims Kensington had made in its cross-complaint against Pacific. The court further declared that neither of the primary policies issued by Lincoln had been "properly exhausted" and consequently, Topa's July 19, 2005-June 11, 2006 excess policy had not been triggered.

Trial in the remaining portion of the combined action involving Kensington took place between January 4 and January 24, 2012. In a comprehensive statement of decision the court found the following: (1) The prior default judgment established that the Topa excess policy had not been triggered because the Lincoln policies had not been exhausted, and Kensington could not relitigate that point under the doctrine of collateral estoppel; (2) the 05-06 policy had not been exhausted because $350,000 of the $1 million settlement payment to Kensington must be allocated to the Lincoln policies issued to

___

[4] Anticipating the default judgment (because Lincoln had withdrawn its answer), Kensington had asked the court to delay the Topa v. Lincoln trial until after the Topa v. Kensington trial had been concluded. The default judgment evidently disposed of that request.

5

Rojas; (3) the 05-06 policy had not been exhausted because the payment to Kensington "was not made to satisfy a final judgment against Pacific, nor did it result in a final, actual settlement with Pacific"; and (4) after the $1 million payment to Kensington is reduced by the $350,000 allocation to Rojas, the remaining amount must be allocated pro rata between the 04-05 and 05-06 primary policies, thereby exhausting neither.

After judgment was entered on May 4, 2012, Kensington moved for a new trial, asserting both procedural errors and insufficiency of the evidence. The court denied the motion on June 22, 2012[5] and subsequently entered an amended judgment that included an award of $47,241.09 to Topa for costs.

*Discussion*

Kensington contends that the trial court erred in two essential respects: by finding that the 04-05 policy issued by Lincoln covered the damage described in Kensington's claims against Pacific; and by finding that the 05-06 policy had not been exhausted. It is settled that "[t]he interpretation and application of an insurance policy to undisputed facts presents a question of law subject to this court's independent review." (*State Farm General Ins. Co. v. Frake* (2011) 197 Cal.App.4th 568, 577.) Where, however, there is no issue over the meaning of policy terms and "the application of . . . policy language involves disputed facts or inferences drawn from undisputed facts," the trial court's findings are reviewed for substantial evidence. (*Axis Surplus Ins. Co. v. Glencoe Ins. Ltd.* (2012) 204 Cal.App.4th 1214, 1222.)

*1. The Trial Court's Allocation*

As noted, the trial court found that the 04-05 policy had not been exhausted for several reasons. First, it applied collateral estoppel to the prior default judgment in which

---

[5] In the same order the court denied Topa's motion for sanctions under Code of Civil Procedure section 2033.420. That portion of the June 22 order is the subject of Topa's separate appeal in H038685.

6

it had found that the 04-05 policy was applicable and that both Pacific policies "must exhaust" before the Topa excess policy was triggered.  Second, the court found that the 04-05 policy was applicable notwithstanding the "strategic" attempt in the Lincoln-Kensington settlement agreement to allocate the $1 million payment entirely to the 05-06 policy, which would have exhausted that policy and triggered the Topa excess policy.  The court further observed that Lincoln had assumed Pacific's defense under both of its policies.  Because Lincoln settled before actual damages were established, the $1 million payment had to be allocated between the two primary policies.  The court considered and rejected Kensington's arguments that the terms of the 04-05 policy and the nature of the damage precluded coverage.  Alternatively, the court found that the "anti-*Montrose*" provision[6] in both primary policies compelled an allocation of the damage—and the $1 million payment—entirely to the 04-05 policy, leaving the 05-06 policy available for primary coverage.

Finally, the trial court found that the settlement actually resolved the claims against Rojas as well as those against Pacific, "and so equity requires an allocation of the

---

[6] The term "anti-*Montrose* provision" refers to the "continuous injury trigger of coverage" holding in *Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 685-687 ["where successive CGL policies have been purchased, bodily injury and property damage that is continuing or progressively deteriorating throughout more than one policy period is potentially covered by all policies in effect during those periods"].) The referenced provision in the 04-05 policy stated:  "This insurance does not apply to any . . . 'property damage' that is continuous or progressively deteriorating and that first manifests prior to the effective date of this policy or after the expiration of this policy, even if such injury or damage continues or deteriorates during the time of this policy." The term "first manifests" was subsequently explained as the time it is "apparent to any person."  In addition, the policy stated:  "In the event this policy is renewed and coverage extends for more than one term, the following applies:  (1) The most we will pay for . . . 'property damage' that is continuous or progressively deteriorating, and that first manifests during one of the period of this policy, is the applicable limit of insurance available with respect to that one policy period."  The 05-06 policy contained the same limitations.

settlement payment between the policies issued to Pacific and Rojas." Thus, the court allocated $350,000 to the Rojas policy, leaving $650,000 to be applied to both of the Pacific primary policies. Because that allocation did not exhaust either of those primary policies, Topa's excess policy had not been triggered.

Kensington's position on appeal regarding the reallocation issue is directed at the policy terms, which it believes excluded coverage under the 04-05 policy period. Kensington specifically contends that (1) a "products-completed operations hazard" provision required that the work be completed or abandoned in order for coverage to apply, and Pacific's work was ongoing after expiration of the 04-05 policy term;[7] (2) coverage was unavailable for Kensington's claims against Pacific based on an exclusion for work on a "condominium, townhouse, or apartment project"; and (3) Lincoln's anti-*Montrose* policy provision limits coverage to damage *manifested* (not caused) during a single policy period, which the evidence showed to be the 05-06 policy term.

Kensington further contends that the court "had no basis" for its $350,000 reallocation of the $1 million payment to the Rojas policies. We will focus our discussion on this discretionary application of equity, which we find to be sufficient to support the judgment. (Cf. *Axis Surplus Ins. Co. v. Glencoe Ins. Ltd.*, *supra*, 204 Cal.App.4th 1231 [equitable allocation of liability among responsible insurers reviewed for abuse of discretion]; *Hartford Cas. Ins. Co. v. Travelers Indem. Co.* (2003) 110 Cal.App.4th 710, 724 [same].)

Kensington asserts error in the equitable reallocation to the Rojas policies in three respects: (1) there was no substantial evidence of Rojas's liability for any of the damage; (2) the court improperly based its ruling on statements made during mediation, which not

---

[7] The trial court rejected this assertion as unsupported by any limitation or exclusion in the policy; it found only a definition of "products-completed operations hazard."

only were protected statements but also were inadmissible parol evidence; and (3) the court "ignored" its previous contrary ruling approving the good-faith settlement between Rojas and Kensington. We find each of these arguments unconvincing.

Kensington insists that the damage was confined to waterproofing membranes that leaked and the failure of deck guardrails and handrails due to improper welding and coating. Rojas, by contrast, "was originally hired to perform framing and siding work, and only the siding work touches upon Kensington's claim in any way in that Rojas *may* have set inboard base of wall/sheet metal in April, 2005, to await attachment to waterproofing membrane applications later in the year by Pacific." Moreover, Rojas's siding work was performed on only one of the buildings before May 2, 2005; thereafter the siding work and associated flashing were installed by another contractor.

The trial court rejected this argument in denying Kensington's motion for a new trial, ruling that "[Lincoln's] own valuation of Rojas' potential liability was sufficient to uphold the [j]udgment." We agree. As noted earlier, Sherry Kretzer, the Lincoln claims representative who had handled the Kensington-Pacific lawsuit, had recommended accepting the $350,000 offer by Rojas. In its statement of decision the trial court noted that, contrary to a recital in the settlement agreement with Pacific, Lincoln had never denied coverage under the 04-05 policy. The court cited trial evidence that Lincoln's "reservation of rights" letter to Pacific, dated April 7, 2006, indicated that it pertained to both the 04-05 and the 05-06 policies. The letter also identified the "date of loss" as May 1, 2005, during the 04-05 policy period. This evidence of Lincoln's own valuation of the claim against Rojas was sufficient to support the court's determination that the settlement was intended to encompass the claims against both Pacific and Rojas.

The evidence derived from Daniel Smith's post-mediation report both explained and reinforced that conclusion. His April 20, 2010 letter, as noted earlier, included the settlement term that all of the $1 million payment would be attributed to Pacific's 05-06

9

policy and that Rojas would be dismissed for no money—but the Rojas condition would not be mentioned in the written settlement document.

Kensington disputes the admissibility of this evidence. Smith's April 20 letter and trial testimony, Kensington emphasizes, was contrary to the testimony of those present at the mediation session, at which "[n]o side deals or 'understandings' were discussed."[8] Kensington contends that admitting the evidence about the Rojas "deal" violated Evidence Code section 1119 and the parol evidence rule.

The court properly rejected these grounds. The April 20 letter was prepared a week after the mediation, "and expressed counsel's impressions of 'other risks associated with this settlement *that were not discussed at the mediation*.' . . . The mediation privilege cannot extend to a communication prepared a week after mediation that discusses issues never addressed at the mediation. Further, [the letter] did not 'materially' relate to, or foster, the mediation. Instead, the letter advised Lincoln General that there could be a problem with the purported terms of the Settlement Agreement because those terms did not include the entire agreement between the parties." No error occurred in finding the mediation-confidentiality privilege inapplicable.

Nor can we find error in the court's refusal to preclude the evidence obtained from Daniel Smith under the parol evidence rule. As the court pointed out, Code of Civil Procedure section 1856, which codifies the parol evidence rule, "has no application to a collateral agreement upon which the instrument is silent, and which does not purport to affect the terms of the instrument." (*Savings Bank of Southern California v. Asbury*

---

[8]   Roderick Standard, vice president of the project management company, and Dean Mabie, assistant general counsel for the general partner of the Kensington partnership, were present at the April 13, 2010 mediation. Standard stated that the settlement did not include a condition that Rojas would be dismissed by Kensington later in the case; there was no discussion of Rojas at all. Mabie also testified that Edward Ruberry had not included Rojas in the settlement offer he made during the mediation session.

(1897) 117 Cal. 96, 103.)  The court properly regarded the arrangement with respect to Rojas as a "separate oral agreement" which was "collateral to" and, more importantly, "not inconsistent with" the terms of the settlement agreement.

We thus see no statutory or judicial barrier to the court's application of equity to reallocate part of the settlement payment to the Rojas policy.  The court was not bound by the earlier ruling (by a different judge of the superior court) approving the Kensington-Rojas settlement as made in good faith.  (See *Gouvis Engineering v. Superior Court* (1995) 37 Cal.App.4th 642, 650.)  The court found that the mediation and settlement agreement "have been used as shields by Kensington to preclude an investigation by the Court into the realities of the various deal points between the parties."  In rejecting the application of the mediation privilege, the court stated, "The mediation privilege was argued to block inquiry into what the stakes really were.  The Court is aware of the importance of the mediation privilege but it does not properly cover post-mediation discussions which Lincoln General and Kensington both maintained were not part of the settlement.  Those discussions could not have been 'fostering' the mediation not only because they were post the mediation sessions, but because they were not part of the settlement reached according to the parties now advocating the privilege-Kensington and Lincoln General.  Lincoln General and Kensington cannot simultaneously maintain there was no agreement reached regarding exhaustion of the primary policies or the settlement of the Rojas claim, yet still block the admission and consideration of those facts."

Similarly, in rejecting Kensington's argument for applying the parol evidence rule the court stated:  "Kensington urged the Court to treat the document as an 'integrated contract' and to follow the parole [*sic*] evidence rule; thus, Kensington's argument is [that] this is an open-and-shut case and what was occur[r]ing behind the scenes between Kensington and Lincoln General is of no consequence to this decision.  However, in the words of the Ninth Circuit in *Slottow* [*v. American Cas. Co.* (9th Cir. 1993) 10 F.3d 1355,

11

1359], [¶] 'Far from deferring to allocations such as these, we view them with considerable suspicion because of the risk that liability may have been allocated for strategic reasons, as almost certainly happened here. We can't blame the bank or Slottow for trying to structure the settlement in a manner that best served their interests; but we can't let their allocation bind American.' "

The trial court here found it noteworthy that in discussing the claim against Rojas, "[f]igures of $250K, $350K and $500K" were exchanged, "and yet in the end, nothing was paid to settle the Rojas claim." The court recalled that Kensington, which "obviously felt . . . bound" to make the arguments Lincoln would have made, had "spent much time arguing [that] Rojas was not liable" and that it "did not have any problems with [Rojas's] work"; but when asked why Lincoln would be prepared to offer $350,000 on behalf of Rojas, Kensington's counsel had answered, "I don't have the slightest idea." In the trial court's view, "[t]he fact that Kensington's able and experienced counsel could offer no explanation is very telling. . . ." The court thus concluded that "Rojas was not part of the settlement so Lincoln General's limits would be exhausted and Topa would bear the burden of other claims."

We find no error in this reasoning. It was therefore proper for the trial court to conclude that equity required reallocation in light of its factual findings that Kensington and Lincoln were aligned in creating an obligation for Topa, as excess insurer, to step in to provide coverage. Although the circumstances in *Slottow* were different, the Ninth Circuit's rationale is applicable here. There the court refused to give conclusive effect to a settlement where Slottow and the bank were aligned in their interests, each with "a strong incentive to structure the settlement precisely as it did" thus creating "a win-win solution for themselves, with the insurance company footing the bill." (*Slottow*, *supra*, 10 F.3d at p. 1359, citing *Peter Culley & Associates v. Superior Court* (1992) 10 Cal. App. 4th 1484, 1498 [giving presumptive effect to settlement allocation unjustified if not the product of adverse negotiation].) Likewise, given the evidence

12

presented at trial, here the trial judge was entitled to view the settlement between Kensington and Lincoln with "considerable suspicion."

In support of its decision to reallocate the payments, the trial court also cited *St. Paul Mercury Ins. Co. v. Frontier Pacific Ins. Co.* (2003) 111 Cal.App.4th 1234 and *North American Capacity Ins. Co. v. Claremont Liability Ins. Co.* (2009) 177 Cal.App.4th 272, and *Golden Eagle Ins. Co. v. Foremost Ins. Co.* (1993) 20 Cal.App.4th 1372, 1390 (*Golden Eagle*). In *St. Paul* the appellate court remanded for an allocation of fault between the crane company and the subcontractor, where the crane company's settlement of the underlying litigation included payment amounts attributable to the subcontractor's fault. In *North American Capacity*, a dispute between two insurers in a construction defect case, the court found substantial evidence supporting the trial court's reallocation of settlement payments, in part based on an expert's opinion regarding the relative responsibility of the multiple subcontractors on the job. In *Golden Eagle*, where settlement occurred before actual damages could be established through trial, the court determined that the defendant insurer, Foremost, was obligated to contribute to the settlement based on its pro rata share of the total respective policy limits at risk. (*Golden Eagle*, *supra*, at p. 1390.) Applying this precedent, the trial court allocated the settlement payments evenly between Lincoln's two policies.

Kensington does not take issue with the holdings of *St. Paul*, *North American Capacity*, and *Golden Eagle*. Instead, it attempts to distinguish these cases on the grounds that here there was no substantial evidence of covered property damage during the 04-05 policy period and that no substantial evidence existed as to Rojas's liability. We have reviewed the voluminous record, however, including the settlement demand and $350,000 offer for Rojas and the testimony of Roderick Standard, Dean Mabie, Daniel Smith, Eric Shroter, Christine Weaver, and Joseph Fraiser. Taken together, this evidence provides a sufficient basis to support the trial judge's findings of fact. Whether we would have reached a different conclusion is immaterial, as "it is not the function of a

13

reviewing court to reweigh the evidence, judge credibility of witnesses, or . . . determine the weight to be given expert testimony." (*Beckman Instruments*, *Inc*. *v*. *County of Orange* (1975) 53 Cal.App.3d 767, 775; see *St. Paul Mercury Ins*. *Co*. *v*. *Mountain West Farm Bureau Mutual Ins*. *Co.* (2012) 210 Cal.App.4th 645, 659 [finding of responsibility of framing contractor for construction defects supported by record notwithstanding contrary evidence of its insurer].)  We therefore must uphold the trial court's allocation of responsibility for some of the damage that manifested in early 2005.  As substantial evidence supported its factual findings and its equitable allocation of the settlement payments was within its discretion, reversal is not warranted.[9]

*Disposition*

The judgment is affirmed.

---

[9]   As this conclusion is dispositive, we need not address the court's application of collateral estoppel to the finding that neither of the Lincoln policies was properly exhausted.  We further reject Kensington's assertion that it was deprived of a right to a jury trial on the issue of whether the 04-05 policy was triggered, which in turn depended on the "existence and timing of damage to the subject property."  As Kensington acknowledges, this was not a lawsuit against Topa for damages; it was not a case in which a declaratory relief claim " 'is in effect used as a substitute for an action at law for breach of contract.' "  (*Entin v*. *Superior Court* (2012) 208 Cal.App.4th 770, 779.)  Even if underlying factual questions would have been amenable to determination by a jury in the course of the litigation, the court's equitable rulings obviated a jury trial on the coverage issue resolved in the prior proceeding.  (Cf. *Nwosu v*. *Uba* (2004) 122 Cal.App.4th 1229, 1238 [court's resolution of equitable issues may dispose of the legal claim calling for jury trial].)

_____

ELIA, J.

WE CONCUR:


_____

PREMO, Acting P.J.



_____

MÁRQUEZ, J.