[Civ. No. 36199. First Dist., Div. One. May 31, 1977.]

LILLI ANN CORPORATION, Plaintiff and Appellant, v.
CITY AND COUNTY OF SAN FRANCISCO,
Defendant and Respondent.

[Civ. No. 38099. First Dist., Div. One. May 31, 1977.]

SAFEWAY STORES, INCORPORATED, Plaintiff and Appellant, v.
CITY AND COUNTY OF SAN FRANCISCO,
Defendant and Appellant.

Orrick, Herrington, Rowley & Sutcliffe, James K. Haynes, William F. Alderman, Justin T. Beck, Johnston, Klein, Horton, Solomon & Baker, V. Judson Klein, Paul W. Baker and Earl D. Osborn for Plaintiffs and Appellants.

Thomas M. O'Connor, City Attorney, and George E. Baglin, Deputy City Attorney, for Defendant and Respondent and for Defendant and Appellant.

## OPINION

**SIMS, Acting P. J.**—These two appeals, which have been ordered consolidated for the purposes of oral argument and decision, involve the validity of taxes paid to the City and County of San Francisco (the city) under protest by each of the plaintiff taxpayers. The taxes were assessed in 1967 as escaped assessments (Rev. & Tax. Code, § 531[1]) on the basis of reappraisals and reassessments of personal property for the years 1964, 1965 and 1966. The reappraisals and reassessments were made and the taxes were levied as a result of the so-called "Knoff mandate," which followed a grand jury investigation of the assessment practices during the years in question. The background and the resulting escaped assessments have been the subject of other litigation.[2] The taxpayers take the position that the convicted assessor, as did the legendary Robin Hood, took from the rich,—the owners of personal property consisting of business inventories and equipment—and thereby relieved the poor—the owners of real estate, particularly owners of residential real property and household furnishings and equipment—from the burden of an equalized contribution to local ad valorem taxes. They assert that the city cannot assert a right to collect taxes from those among the disfavored taxpayers who allegedly received special treatment through assessments lower than generally imposed on business inventories and equipment, because they were still assessed higher than the general ratio to actual market value of assessments of all taxable property within the city and county.

On the other hand the city contends that in *Knoff* v. *City etc. of San Francisco* (1969) 1 Cal.App.3d 184 [81 Cal.Rptr. 683], the court approved proceedings in which it and its responsible officials were mandated to make the assessments and levy the taxes which have been attacked in these cases. It also asserts that there was no error in assessing personal property used in business by standards which produced assessments which were a greater percentage of actual market value than resulted from the method of assessing residential real property, because the

[1]At all times material section 531, which has since been otherwise amended, provided and provides in pertinent part: "If any property belonging on the local roll has escaped assessment, the assessor shall assess the property on discovery at its value on the lien date for the year for which it escaped assessment. . . ."

[2]See *People* v. *Wolden* (1967) 255 Cal.App.2d 798 [63 Cal.Rptr. 467] [cert. den. (1968) 391 U.S. 965 (20 L.Ed.2d 877, 88 S.Ct. 2032)]; *Knoff* v. *City etc. of San Francisco* (1969) 1 Cal.App.3d 184 [81 Cal.Rptr. 683]; *Koret of Cal., Inc.* v. *City etc. of San Francisco* (1969) 2 Cal.App.3d 87 [81 Cal.Rptr. 698]; *Bauer-Schweitzer Malting Co.* v. *City and County of San Francisco* (1973) 8 Cal.3d 942 [106 Cal.Rptr. 643, 506 P.2d 1019]; *Bret Harte Inn, Inc.* v. *City and County of San Francisco* (1976) 16 Cal.3d 14 [127 Cal.Rptr. 154, 544 P.2d 1354].

taxpayers here can only compare their assessments on business property with those of property of like character similarly situated. Finally it contends that the taxpayers should be denied relief because of their participation, by act or omission, in the original unequal assessments.

We conclude that the general contentions of the taxpayers must be sustained.[3] The judgment in favor of plaintiff Safeway Stores, Incorporated (Safeway) must be affirmed. The judgment denying recovery to plaintiff Lilli Ann Corporation (Lilli Ann) must be reversed. The cross-appeal of Safeway from so much of the judgment as denied it compound interest is found to be without merit.

*Appeal of Lilli Ann*

Lili Ann sought the recovery of $79,898.65 in taxes paid under protest on its personal property to the city for the years 1964-1966. The complaint filed October 26, 1967, alleged that on or about March 8, 1967, the county assessor levied escaped and penal assessments on its personal property, purporting to be on the supplemental roll for the tax-year 1966. So far as is material to this appeal, the complaint alleged, among other grounds, as had been stated in the protest accompanying the payment of taxes, as follows:

"In each of the years 1964 through 1966, plaintiff was originally assessed at a ratio of assessed value to full cash value for its locally assessable tangible personal property at a ratio very substantially in excess of the ratios for the years in question for all locally assessable real property in the City and County of San Francisco and for all locally assessable tangible property in the City and County of San Francisco, in violation of Article I, Sections 11 and 13, Article XI, Section 12, and Article XIII, Sections 1 and 14 of the Constitution of the State of

[3]The foregoing conclusion renders it unnecessary to consider Lilli Ann's contention that the market value of its inventory and equipment during the years in question was erroneously computed. (Cf. *Bret Harte Inn, Inc.* v. *City and County of San Francisco, supra,* 16 Cal.3d 14, 25-27.) It also disposes of Safeway's claims that in any event it was entitled to relief (1) to the extent of one-third of the escaped assessments because similar consideration was given other taxpayers, (2) to the extent that fixtures were included in the property assessed as escaping assessment, and (3) to the extent of certain reserved issues.

California,[4] the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States of America, and the Revenue and Taxation Code of California, including Section 1605 thereof. The escaped and penal assessments with respect to each of the years 1964 through 1966 were, and are, wholly void, illegal, unlawful and unconstitutional in that they and each of them increase the original discrimination. . . ."

". . . [T]hat said escaped and penal assessments were made during the 1967-1968 assessment year. Accordingly, Section 1605 of the Revenue and Taxation Code of California as amended by Chapter 147, 1966 First Extraordinary Session California Legislature was, and is, applicable to said assessments. With respect to each of said years 1964 through 1966, the ratio of assessed to full cash value deviated, and continues to deviate, by more than 15 percent from the final ratio of assessment of all property in the county as found by the State Board of Equalization of the State of California in each of said years."

"The audit, reassessment and making of escaped and penal assessments for each of the years 1964 through 1966 against plaintiff was, and is, void, illegal and unconstitutional, and in contravention of, and prohibited by Article I, Sections 1, 11 and 13 [see fn. 4 above] of the Constitution of the State of California and the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States of America for the reason that only the personal property of business taxpayers who previously had personal property assessments in excess of $50,000 were specially audited, specially reassessed or were the subject of special escaped assessments. The personal properties of smaller businesses, which during each of the years

---

[4]Because of revisions of the California Constitution, the last of which was effected November 5, 1974, the provisions upon which the taxpayer relies are now found, in some cases in altered form, in article IV, section 16, subdivision (a), article I, section 7, subdivision (a), and article XIII, sections 1, subdivision (b), 1, subdivision (a) and 2, respectively. (See fns. 9, 10 and 11, and accompanying text below.)

Because of, the conclusions reached below we do not explore the taxpayers' equal protection and due process arguments. (See U.S. Const., amend. XIV; Cal. Const., art. I, § 7 [note former § 13], art. IV, § 16, subd. (a) [note former art. I, § 11]; *Hillsborough v. Cromwell* (1946) 326 U.S. 620, 623-624 [90 L.Ed. 358, 363, 66 S.Ct. 445]; *Cumberland Coal Co.* v. *Board* (1931) 284 U.S. 23, 28-30 [76 L.Ed. 146, 149-151, 52 S.Ct. 48]; *Sioux City Bridge* v. *Dakota County* (1923) 260 U.S. 441, 445 [67 L.Ed. 340, 342-343, 43 S.Ct. 190, 28 A.L.R. 979]; *Haman* v. *County of Humboldt* (1973) 8 Cal.3d 922, 926-927 [106 Cal.Rptr. 617, 506 P.2d 993]; and *Metropolitan Stevedore Co.* v. *County of Los Angeles* (1972) 29 Cal.App.3d 565, 572 [105 Cal.Rptr. 595]. Cf. *Nashville C. & St. L. Ry.* v. *Browning* (1940) 310 U.S. 362, 366-369 [84 L.Ed. 1254, 1256-1258, 60 S.Ct. 968].)

1964 through 1966 were assessed at a lower ratio than plaintiff's personal property, were not specially reassessed or made the subject of special escaped assessments and non-business personal property and real property were not reassessed or made the subject of escaped assessments at all, all with the result that, even if 50% were to be the proper ratio for each of the years 1964 through 1966, there was, is and will be discrimination in the application of such ratio and in the application of the law resulting from the making of escaped assessments."

Lilli Ann made application to the county board of equalization for a hearing for equalization with regard to the assessments. On April 24, 1967, the board denied the application for equalization and adopted the escaped and penal assessments made by the assessor. At the hearings on the application for equalization, Lilli Ann was not allowed to present evidence with respect to the application. On April 28, 1967, Lilli Ann paid the escaped and penal assessments of $79,898.65 under protest.

The city answered by general denials and affirmative defenses. It alleged that the escaped assessments were made in compliance with the *Knoff* writ and judgment. The city denied that the assessor had assessed all tangible personal property owned by Lilli Ann on the first Monday of March 1964, 1965 and 1966. It alleged that *Knoff* compelled the use of the 50 percent ratio, and that Lilli Ann's application for equalization went against the requirements of *Knoff.* Thus, the board of equalization purportedly acted according to the dictates of *Knoff* in denying the application. The additional defenses raised by the city included the following allegations:

That in 1964 and 1965, Lilli Ann failed to file property statements as required by the Revenue and Taxation Code and the California Constitution; that the 1966 property statement filed by Lilli Ann did not accurately set forth the costs of its taxable property; and that there was intentional underreporting on the statement.

That Lilli Ann's action was a collateral attack on the *Knoff* judgment and mandate of March 28, 1966 and April 3, 1967, order and the continuing jurisdiction of the superior court in the matter. According to the city, the superior court could not in any way review or disturb the judgment or mandate of *Knoff* in this collateral action since Lilli Ann could have intervened in *Knoff* had it wanted to do so.

That Lilli Ann did not intervene in *Knoff* when it had an opportunity to do so and is now estopped from making a collateral attack.

That since Lilli Ann failed to file sworn property statements as required by law for the years 1959-1965 and there were underassessments. of its property in these years by former assessor Wolden, Lilli Ann is indebted to the city for over $79,898.65.

That Lilli Ann comes into court with unclean hands.

After hearing the court made findings which include the following: "1. The assessments in question were levied as a consequence of, and in compliance with, the judgment and writ of mandate entered and issued March 28, 1966 in *Knoff v. San Francisco, et al.,* San Francisco Superior Court Action No. 564237, aff'd 1 C.A.3d 184, hereinafter referred to as the Knoff judgment and writ, and the taxes of which plaintiff seeks recovery were collected pursuant thereto."

Other findings, which are reviewed below, sustained the city's position on the theory that the escaped assessments rectified a discrepancy between Lilli Ann and others favored by the assessor and other business personal property taxpayers. (See text preceding fn. 8.)

The court made conclusions of law in support of the city, and entered judgment in its favor. The appeal, the subject of these proceedings, ensued.

### Appeal of the City and County (Safeway case)

On February 28, 1968, Safeway filed a complaint for recovery of property taxes paid under protest to the city. The complaint alleged that on or about July 26, 1967, the San Francisco Assessor added to the 1966-1967 San Francisco assessment roll certain escaped and penal assessments purportedly relating to property owned by Safeway in the years 1964, 1965 and 1966. On August 7, 1967, the Clerk of the San Francisco Tax Appeals Board wrongfully refused to accept and file Safeway's petition for equalization of the escaped and penal assessments. As a precautionary measure, on August 10, 1967, Safeway filed an application for equalization with the Clerk of the San Francisco Board of Supervisors. It is further alleged that on August 28, 1967, the board of supervisors, purporting to act as a county board of equalization, denied

the application for equalization. On August 21, 1967, in proceeding No. 582106, the superior court issued a peremptory writ of mandate directing the Clerk of the San Francisco Tax Appeals Board to file the petition for equalization. On the same day the clerk of the tax appeals board accepted custody of the petition for equalization and assigned it a file number but no hearing had been set on the petition at the time the complaint was filed.[5] On August 31, 1967, plaintiff paid under protest to the San Francisco Tax Collector $181,464.44 in taxes with respect to the previously mentioned escaped and penal assessments.

The complaint refers to and adopts the grounds set forth in its petition for equalization and its protest, copies of which were attached to the complaint. So far as is pertinent to the issues on this appeal it was alleged that the ratio of assessed to full cash value of the property allegedly escaping assessment was erroneous because the assessor used a 50 percent ratio of full cash value in determining the assessed value of the allegedly escaped business personal property, whereas other property allegedly was assessed as follows:

"i) The average assessment ratio prevailing generally upon locally assessable tangible property in San Francisco was in fact only 22.1% in 1964, 22.2% in 1965, and 19.2% in 1966. These latter percentages are the findings of the California State Board of Equalization published under Rev. & Tax. Code section 1819.

"ii) A 50% ratio was not the uniform ratio at which all, or even most, personal property within the county was assessed in any of the years 1964, 1965, and 1966. No one ratio was uniformly applied to personal

[5]On October 27, 1969, contemporaneously with the filing of its opinion in *Knoff* v. *City etc. of San Francisco, supra,* 1 Cal.App.3d 184 [81 Cal.Rptr. 683], Division Four of this court filed its unpublished opinion in *Safeway Stores, Incorporated* v. *Dolan,* 1 Civil 25939. That decision indicates that the order compelling the Clerk and Administrator of the San Francisco Tax Appeals Board to accept and file Safeway's application for equalization relief had become final. The appeal involved a subsequent order which required the board to set the application for hearing. The court pointed out that the matter of securing equalization relief had progressed through the board of supervisors, sitting as a board of equalization, where it was denied, and was pending in the courts in the action which is now the subject of the city's appeal, and that neither the board nor its members had been made party to the action in which the order had been made. Rather than dismissing the appeal as moot, the Court of Appeal reversed the order upon the ground that the relief it granted departed materially from that sought in the action and from that sought in the peremptory writ of mandate which it purported to enforce. As to Safeway, that decision establishes that the taxpayer had exhausted its administrative remedies.

property in those years; the ratio generally applied to such property was not in excess of 25% in any of said years.

"iii) Real property in the county was assessed, in each of the years 1964, 1965, and 1966, at a ratio of assessed to fair market value not in excess of 20%. Assessment of petitioner's personal property at a ratio of 50% will therefore result in placing a tax burden upon petitioner's personal property greater than that imposed upon real property, in violation of Article XIII, Section 14 of the California Constitution."

Safeway sought recovery of the $181,464.44 in property taxes paid in protest, together with interest on the sum from August 31, 1967, until the date of judgment and plaintiff's costs of suit.

The city answered by general denials and affirmative defenses. It alleged compliance with the superior court's judgment and writ of mandate of March 28, 1966, and order of April 3, 1968, in *Knoff*; that Safeway did not come into court with clean hands; and that in conformance with *Knoff*, a 50 percent assessment ratio was required to be applied in making escaped assessments; and that it was not material that true cost figures may have been reported.

The matter was heard in another department of the superior court. On April 4, 1975, the court entered judgment in Safeway's favor for the full tax amount of $181,464.44. The judgment was based on the conclusion by the court that there had been discriminatory compliance with the *Knoff* writ in that it had been carried out only with respect to business personal property taxpayers. The city has appealed from that judgment. The superior court included in its judgment, under Revenue and Taxation Code section 5141, prejudgment interest of $86,756.52. Safeway has cross-appealed from that portion of the judgment, claiming that the interest award under section 5141[6] should have been $108,076.70 or $21,320.18 more than the superior court awarded.

---

[6]Section 5141 was repealed by Statutes of 1976, chapter 499, section 11, No. 3 Deering's Advance Legislative Service. page 108. The provisions of that chapter which became operative March 1, 1977. expressly provide: ". . . Interest on taxes which became due and payable before March 1. 1977. shall be subject to the provisions on payment of interest in effect prior to January 1. 1977." (§ 5150 as added by Stats. 1976. ch. 499. § 13. No. 3 Deering's Adv. Legis. Service, p. 111.)

*Applicability of the Knoff Mandate*

The taxpayer's suit that triggered the reappraisals, reassessments and taxes which are the subject of these proceedings produced on March 28, 1966, a judgment and an original writ of mandate which ordered the city and its responsible officers to conduct a full investigation, inquiry and examination through independent expert auditors, appraisers and certified public accountants for the purpose of gathering full information and facts concerning taxable properties. It further ordered "prompt and appropriate action at the time and in the manner authorized by law or directed by [the] court . . . to make and enter new assessments, including penal assessments authorized by law, and to recover any property taxes rightfully owing . . . ."

In upholding the judgment for issuance of the peremptory writ the court pointed out, "The judgment is explicit in terms of the steps to be taken by the public officers it reached, the objectives to be pursued, and the methods to be used, but it directs no specific result as to any individual assessments or taxpayers." (1 Cal.App.3d at p. 197.) It added, "The judgment nowhere conceives that appellants should or would exceed any of their legal powers in acting pursuant to the writ of mandate. (The writ, in fact, is explicit to the opposite effect: it repeatedly directs the affected officials to act 'as authorized by law' or subject to limiting words of similar import.) Whether they exceed their legal powers at any point is a matter to be resolved between them and the affected taxpayers at that time." (*Id.,* p. 202. See also *Bret Harte Inn, Inc.* v. *City and County of San Francisco* (1976) 16 Cal.3d 14, 19-20 [127 Cal.Rptr. 154, 544 P.2d 1354]; *Bauer-Schweitzer Malting Co.* v. *City and County of San Francisco* (1973) 8 Cal.3d 942, 945 [106 Cal.Rptr. 643, 506 P.2d 1019]; and *Koret of Cal., Inc.* v. *City etc. of San Francisco* (1969) 2 Cal.App.3d 87, 91 [81 Cal.Rptr. 698].)

In *Knoff,* the court, however, went further. On April 3, 1967, it made an order purporting to instruct the board of supervisors, county board of equalization, the city itself, and the new assessor in the manner in which to conduct the duties imposed by the peremptory writ. The court, among other findings, stated: "1. The assessment ratio of 50% was publicly designated and announced by former Assessor Russell L. Wolden as the proper assessment ratio and it in fact was actually adopted, used and applied by him to 93% of the San Francisco personal property taxpayers during the years 1962-1966"; "8. For the purposes of compliance with this Court's Peremptory Writ of Mandate, the State Board of Equaliza-

tion's county-wide average assessment ratios relating to the years 1962-1966 are illegal as a standard for calculating correct and accurate assessed valuations of San Francisco property"; and "9. The State and Federal Constitutions require a uniform application of an assessment ratio to all property within the same class, and when, through a public taxpayers' action, a nonuniform application of an assessment ratio has been demonstrated, equalization is not to be accomplished by reducing the taxes to a figure arrived at through the use of the improperly low assessment ratio applied to taxable property of a favored few, but rather by increasing the assessed valuations of those who benefited from such favored treatment—regardless of whether the benefit was obtained through fraud or otherwise."

The court then instructed the board of supervisors that when sitting as a county board of equalization it "(a) shall neither consider nor adopt, as a basis for reduction of said deficiency assessments or otherwise, 'an average assessment ratio'. or a 'mean' or 'mean average' assessment ratio or any assessment ratio other than a 50% assessment ratio and said latter ratio shall be the sole ratio to be applied in the determination of the correct assessed valuations upon which assessment deficiencies have been levied with respect to the years prior to the 1967-1968 fiscal years, and (b) shall not consider, use, or allow to become part of any record of the County Board of Equalization pertaining to the application for reduction of deficiency assessments made under or pursuant to the Knoff Mandate, any evidence offered in support of an 'average' or 'mean' or 'mean average' assessment ratio with respect to the years prior to the 1967-1968 fiscal year."

The city's grounds of appeal from the foregoing order were categorized as follows: ". . . (1) the order invokes the erroneous concept that different assessment ratios must be applied as between real and personal property; (2) that it erroneously prohibits the board of equalization from considering the 'average' 1964-1966 assessment ratio in dealing with applications for equalization of new assessments made by Tinney for those years; and (3) that it erroneously forecloses relief to taxpayers who are affected by it and who seek relief from it before the board of equalization." (*Knoff* v. *City etc. of San Francisco, supra,* 1 Cal.App.3d at p. 205.) The court disposed of the first argument by stating: "[C]ontrary to appellant's interpretation, the April 3 order does not require the application of different assessment ratios as between real and personal property. (Appellant's arguments go to the order's 'theory'; we refer to its explicit terms, which neither differentiate between classes of

property nor require different ratios to be applied as between real and personal property.)" (*Id.*)

With respect to the second and third arguments the court observed, and concluded: "The main judgment and the peremptory writ of mandate issued pursuant thereto (the latter of which we have upheld by affirming the former) established only that the affected public officers must examine past (i.e., Wolden's) assessments and adjust them to the extent necessary and legally possible. The order of April 3, 1967, sets a standard for compliance with the peremptory writ in significant respects. If the standard was wrong in the case of any affected taxpayer (e.g., because such person could show a competent court that he had received discriminatory treatment as a consequence of official compliance with the writ), only that taxpayer can complain: the City and County of San Francisco cannot, the board of supervisors and the board of equalization cannot, the assessor cannot. The question posed by appellants' arguments on this point relate only to the interests (if any) of affected taxpayers. We conclude that the interests of appellants—whatever they might be, even considered severally—are not 'injuriously affected' by the April 3 order; for this reason, we dismiss their appeal from it. [Citation.]" (*Id.,* pp. 205-206.)

 The inapplicability of either the *Knoff* judgment, its peremptory writ, and its supplemental order to the taxpayers who are parties to these proceedings is evident from the terms of the *Knoff* decision itself. It has also been recognized in *Bret Harte Inn, Inc.* v. *City and County of San Francisco, supra,* where the court stated, "We reject at the outset the contention of amicus curiae that plaintiff is foreclosed by principles of res judicata from raising any objection to the method of valuation in this proceeding. The argument, as we understand it, is that because the *Knoff* mandate, as upheld in *Knoff* v. *City etc. of San Francisco, supra,* 1 Cal.App.3d 184, concerned itself not with valuation practices but with a uniform application of the appropriate assessment *ratio,* all persons subject to that mandate, in contesting any tax subsequently levied pursuant to it, were limited to challenges relating to ratio. This argument fails on two grounds. In the first place, plaintiff was not a party to the *Knoff* proceeding, and the interests of all parties to that proceeding were adverse to those of plaintiff, a taxpayer resisting the imposition of further taxes. In these circumstances plaintiff could in no way be bound by the determinations made in that case. [Citation.] Secondly, we do not read the *Knoff* mandate as narrowly as amicus curiae would have us. The Court of Appeal, in accurately characterizing and summarizing the writ,

made it quite clear that the mandate contemplated a complete reexamination of the issue of taxes legally owed by the taxpayers in question. Moreover, it indicated that matters of abuse of powers under the writ were 'to be resolved between them and the affected taxpayers at that time [i.e., in the course of normal proceedings for the challenge of escape assessments made].' (*Knoff, supra*, at p. 202.) Plaintiff has undertaken such proceedings, and the question it seeks to raise is now properly before us." (16 Cal.3d at pp. 19-20. See also *Koret of Cal., Inc.* v. *City etc. of San Francisco, supra*, 2 Cal.App.3d 87, 91 [decided by the same panel as *Knoff*.]

In Lilli Ann's case the findings of the court recognized that the *Knoff* judgment and writ left it open for plaintiff to show a competent court—the superior court—that it had received discriminatory treatment as a consequence of official compliance with the writ. The court also found that the assessments in question were levied and the taxes were collected as a consequence of and in compliance with the judgment and writ of mandate entered and issued in *Knoff* on March 28, 1966, and that Lilli Ann's application for equalization was denied by action taken in conformance with the order of April 3, 1967. For reasons stated above, and recognized by the trial court, the latter findings cannot be relied upon to support the judgment in favor of the city. The findings that Lilli Ann failed to show discrimination are reviewed below.

In Safeway's action, however, the court did not confine itself to determining whether the taxing authorities had exceeded their legal powers with respect to the escaped assessments against the taxpayers. (See *Knoff* v. *City etc. of San Francisco, supra*, 1 Cal.App.3d 184, 202.) The court concentrated on the failure of the authorities to reassess all other taxpayers who had been underassessed at the 50 percent of full market value which was mandated by *Knoff*. Lengthy findings were made to establish that, "Acting in response to the *Knoff* writ, defendant intentionally and wilfully adopted and deliberately pursued a systematic plan of investigation, reappraisal, and reassessment which was not uniform for all property but was limited in the burdens imposed to business personal property. Defendant established a pattern of reappraising and reassessing properties at an assessment ratio of 50% as the standard for achieving assessment uniformity under the *Knoff* writ, but did not apply that standard uniformly to all property. The policy of retroactive reassessment at a 50% ratio was restricted to a relatively small group of business personal property taxpayers, and was not applied to real property or to residential personal property taxpayers. Business

personal property had been assessed by former Assessor Wolden at the highest ratios and therefore needed reassessment less than all other types of property in San Francisco. The need for reassessment was greatest in the case of residential property. Defendant had the practical means, prior to the expiration of the statute of limitations, to reassess all taxpayers in San Francisco at a 50% ratio for the tax years 1964, 1965, and 1966." This approach gives rise to a multitude of subsidiary findings and issues which are not essential to a decision of the case.[7]

As will be evidenced by the discussion below, there is no principle of law which permits the taxing authorities to raise assessments for one class

---

[7]In an effort to show that the city, if in fact ordered to do so, could not reassess the inadequately assessed residential real property, the city raises the following contentions: (1) The law did not authorize the escape assessment of already-assessed realty. (Cf. *Clunie* v. *Siebe* (1896) 112 Cal. 593, 597-598 [44 P. 1064]; *Stafford* v. *Riverside County* (1957) 155 Cal.App.2d 474, 477-478 [318 P.2d 172]; *Southwest Land Co.* v. *Los Angeles Co.* (1920) 46 Cal.App. 9, 13-14 [188 P. 575]; and *Napa Savings Bank* v. *County of Napa* (1911) 17 Cal.App. 545, 548 [120 P. 449], with *Bauer-Schweitzer Malting Co.* v. *City and County of San Francisco* (1973) 8 Cal.3d 942, 947-948 [106 Cal.Rptr. 643, 506 P.2d 1019] [disapproving *Stafford* and *Jensen* v. *Byram* (1964) 229 Cal.App.2d 651, 653 [40 Cal.Rptr. 540] to the extent they are inconsistent]; *Beckman Instruments, Inc.* v. *County of Orange* (1975) 53 Cal.App.3d 767, 777-778 [125 Cal.Rptr. 844]; *Hewlett-Packard Co.* v. *County of Santa Clara* (1975) 50 Cal.App.3d 74, 81 [123 Cal.Rptr. 195]; and *Ex-Cell-O Corp.* v. *County of Alameda* (1973) 32 Cal.App.3d 135, 137-140 [107 Cal.Rptr. 839].)

(2) *Bauer-Schweitzer* does not hold that already-assessed realty could be escape assessed, and should only apply to corporate business personal property because a contrary holding would strike at "the people" (homeowners, resident citizens) for whose protection security and benefit government is instituted (Cal. Const., art. I, § 26, formerly § 2); because it would not be politically feasible to levy escaped assessments against 93,000 homeowners; because it would be unlawful to impose taxes in excess of the budgeted expenses (see Gov. Code, § 29101; and *Madary* v. *City of Fresno* (1912) 20 Cal.App. 91, 97-98 [128 P. 340]); because at that time there was virtually no limitation on the assessment of realty which had actually escaped assessment, as distinguished from a two-year statute of limitations on escaped personal property; because there would be a tax revolt; and because mandate would not lie for an unenforceable order.

(3) The law prohibited the collection from citizen-residents of more taxes for 1964, 1965 and 1966 than required to meet the city's budgets for those years. [A contention which overlooks that taxes levied in 1967, would reduce other taxes in that year; and that application of that principle would forestall any levy for escaped assessments.]

(4) The law prohibits the appraisal of property of citizen residents by anyone but their chosen assessor.

(5) *Knoff* was not an action for a mandate commanding the reappraisal and escape assessment of already assessed property (homes, household furnishings and personal effects of citizen residents) because it was instituted as a class action on their behalf and it would be absurd, self-defeating and take their property without notice to so construe it.

(6) Whether or not the taxing authorities interpreted the *Knoff* writ as applying only to business personal property, and, if so, whether they erred.

(7) Whether or not the trial judge in *Knoff* was misled into believing that all property, other than the business property of selected businesses with property assessed at $50,000 or more, was assessed at 50 percent of its fair market value.

of property to the extent that the owners of such property will bear a discriminatory share of the tax burden as measured by full cash value, as compared with the owners of another class of property. It is immaterial whether the discrimination arises because the authorities elect not to raise the assessments on the latter property to the same ratio of full cash value, or whether they are prohibited from doing so. Safeway's pleading and proof support the theory that the escaped assessments were invalid because they intensified, rather than ameliorated, the inequities in the assessments in the taxable years in question. We, therefore, leave *Knoff* and examine the other contentions of the parties.

### Discrimination in Fact

The city's claim that there was no discrimination in fact can be gleaned from the findings made with respect to Lilli Ann's claim for refund. The court found:

"2. Prior to the levy of said assessments and taxes plaintiff was one of 7 per cent of business personal property taxpayers who had received favored treatment from former assessor Wolden by having their inventories assessed at less than 50 per cent, and their equipment at less than 50% of 50% (25%), of cost.

"3. Under former assessor Wolden inventories of small business personal property taxpayers—those in the under-$15,000-assessed-value category—were assessed at 50% of cost, and equipment of such taxpayers was assessed at 50% of 50% (25%) of cost.

"4. Such taxpayers comprised 93% of San Francisco business personal property taxpayers.

"5. The Knoff investigation revealed that plaintiff's inventories were assessed at 26% of cost in 1964, 18% in 1965, and 43% in 1966, and its equipment at 9.4% of cost in 1964, 7.8% in 1965, and 17% in 1966.

"6. The assessments of which plaintiff complains eliminated the favored treatment of which it had been the beneficiary in 1964, 1965 and 1966. A 50% ratio (50% of cost of inventories, 50% of 50% [25%] of cost of equipment) was used in determining plaintiff's assessment deficiencies and eliminating the favored treatment.

"7. The Knoff judgment and writ left it open for plaintiff to show a competent court—the Superior Court—that it had received discriminatory treatment as a consequence of official compliance with the writ.

"8. Plaintiff made no such showing; it failed to show that, after official compliance with the writ, its inventories and equipment had been assessed at a ratio and on a basis of valuation different from that applied to inventories and equipment of other taxpayers."

On the other hand, the taxpayer requested and was denied findings, supported by the evidence, to show the assessed value of its tangible personal property previously taxed in each of the years in question; the full cash value of such property in each such year as admitted by the taxpayer; and the full cash value of such property in each such year as determined by the assessor upon reassessment to determine the escaped assessment. Both sides agree that the escaped assessment, against which the tax rate was applied in order to compute the tax, was the product of the assessor's appraisal of the full cash value times the 50 percent ratio, less the amount previously assessed.

The taxpayer also requested findings, sustained by the proof, to show the following assessment ratios to full market value:

"4. All of the locally assessable real property in the City and County of San Francisco was assessed at an average (*i.e.,* overall) assessment ratio of 19% of full cash values of such property on the first Monday in March in each of the years 1964, 1965 and 1966, respectively.

"5. All of the locally assessable, tangible property, both real and personal, in the City and County of San Francisco was assessed at average (*i.e.,* overall) ratios of 22.1% in 1964, 22.2% in 1965 and 19.2% in 1966 of full cash values of such property on the first Monday in March in each of the years 1964, 1965 and 1966, respectively."[8]

---

[8]In Safeway's action the court found as follows: "IX . . . In the years 1964, 1965, and 1966, plaintiff was assessed on the average at ratios ranging from 37% to 47%, whereas residential real and personal property owners were assessed at much lower ratios, ranging on the average from 9% to 19%. . . . [¶] XX . . . The true facts, . . . were that the only taxpayers in San Francisco who had been assessed in the years 1964, 1965, and 1966 at a 50% ratio were a portion of the business personal property taxpayers who represented approximately 5% of the total assessed value in the City, 15% of the taxpayers in the City, 20% of the total personal property assessed value, and 25% of the personal property taxpayers. . . . [¶] XXI . . . In the years 1964, 1965, and 1966, the vast majority of San Francisco taxpayers were not assessed at a 50% ratio, and were in fact assessed below the ratios at which plaintiff was originally assessed. . ."

The city's position is that the taxpayer must prove (1) that there was a difference in the ratio or basis, in accordance with which its *business personal property* was assessed in making the escaped assessment, from that which was employed in assessing other *business personal property,* or (2) that its *business personal property* was taxed on a greater proportion of its value than other *business personal property.* The taxpayers contend that at all times relevant in this appeal the taxing authorities were required to assess all *taxable tangible property* within the county at the same ratio to its fair market value or full cash value. If the city's contention is correct the findings in *Lilli Ann* support the judgment, and the findings requested by the taxpayer are irrelevant. Conversely, on the same assumption, in the *Safeway* action the court erred in considering evidence of the actual ratio of assessed values to the fair market value of all property. We conclude, however, that the California Constitution and applicable statutes support the taxpayers.

At all times prior to November 5, 1974, that is during the taxable years in which the property of the taxpayers allegedly escaped assessment and the year in which the escaped assessments were made and the taxpayers sought relief, the California Constitution provided as follows: Article XIII section 1: "All property in the State except as otherwise in this Constitution provided, not exempt under the laws of the United States, shall be taxed in proportion to its value, to be ascertained as provided by law, or as hereinafter provided. The word 'property,' as used in this article and section, is hereby declared to include moneys, credits, bonds, stocks, dues, franchises, and all other matters and things, real, personal, and mixed, capable of private ownership; provided, that . . . [there follow exceptions not relevant here]."[9] Article XIII, section 14, part: ". . . The Legislature shall have the power to provide for the assessment, levy and collection of taxes upon all forms of tangible personal property, all notes, debentures, shares of capital stock, bonds, solvent credits, deeds of trust, mortgages, and any legal or equitable interest therein, not exempt from taxation under the provisions of this Constitution, in such manner, and at such rates, as may be provided by law, and in pursuance of the exercise of such power the Legislature, two-thirds of all of the members elected to

[9] Article XIII, section 1 now reads: "Unless otherwise provided by this Constitution or the laws of the United States: [¶] (a) All property is taxable and shall be assessed at the same percentage of fair market value. When a value standard other than fair market value is prescribed by this Constitution or by statute authorized by this Constitution, the same percentage shall be applied to determine the assessed value. The value to which the percentage is applied, whether it be the fair market value or not, shall be known for property tax purposes as the full value. [¶] (b) All property so assessed shall be taxed in proportion to its full value."

each of the two houses voting in favor thereof, may classify any and all kinds of personal property for the purposes of assessment and taxation in a manner and at a rate or rates in proportion to value different from any other property in this State subject to taxation and may exempt entirely from taxation any or all forms, types or classes of personal property. [¶] . . . and no tax burden shall be imposed upon any personal property either tangible or intangible which shall exceed the tax burden on real property in the same taxing jurisdiction in proportion to the actual value of such property."[10] Article XI, section 12 (renumbered and transferred to art. XIII, § 37, June 2, 1970) [Taxation of Local Entities and Local Taxes] provides in part, ". . . [¶] All property subject to taxation shall be assessed for taxation at its full cash value."[11]

Prior to 1966 the mandate of section 37 of article XIII was echoed in section 401 of the Revenue and Taxation Code which stated: "Except as provided in this part [div. I, pt. 2 (§§ 201-1366), Assessment], all taxable property shall be assessed at its full cash value." Prior to the lien date in 1972, section 110 provided: " 'Value,' 'full cash value,' or 'cash value' means the amount at which property would be taken in payment of a just debt from a solvent debtor. In determining the 'actual value' of intangible personal property, the assessor shall not take into account the existence of any custom or common method, if any, in arriving at the full cash value of any class or classes of property."[12]

---

[10]Similar provisions are now found in article XIII, section 2 which provides: "The Legislature may provide for property taxation of all forms of tangible personal property, shares of capital stock, evidences of indebtedness, and any legal or equitable interest therein not exempt under any other provision of this article. The Legislature, two-thirds of the membership of each house concurring, may classify such personal property for differential taxation or for exemption. . . [a]nd the tax per dollar of full value shall not be higher on personal property than on real property in the same taxing jurisdiction."

[11]These provisions of article XIII, section 37, since November 5, 1974, are embraced in article XIII, section 1 (see fn. 9 above).

[12]Section 110 was amended in 1971, effective as of the lien date in 1972. (Stats. 1971, ch. 1542, §§ 1, 2 and 3, pp. 3050-3051.) It was recast to define "Full cash value" or "market value" or "value" in terms now found in the section as amended in 1974. (Stats. 1974, ch. 311, § 3, p. 589.) It now reads, " 'Full cash value' or 'fair market value' means the amount of cash or its equivalent which property would bring if exposed for sale in the open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other and both with knowledge of all of the uses and purposes to which the property is adapted and for which it is capable of being used and of the enforceable restrictions upon those uses and purposes." (See *De Luz Homes, Inc.* v. *County of San Diego* (1955) 45 Cal.2d 546, 563-564 and 566 [290 P.2d 544].) At the same time section 110.5 was added to provide, " 'Full value' means fair market value or such other value standard as is prescribed by the Constitution or in this code under the authorization of the Constitution." (*Id.*, § 3 [second].)

Despite the literal language of the last mentioned constitutional provisions it was recognized that by settled interpretations they authorized assessment at a uniform fraction of full cash value provided the latter remained the standard or basis of each assessment. (See *County of Sacramento* v. *Hickman* (1967) 66 Cal.2d 841, 846-854 [59 Cal.Rptr. 609, 428 P.2d 593], particularly p. 851.)[13] It has recently been emphasized that under the law extant in 1964, 1965, 1966 and 1967, the standard or basis of each assessment was full cash value. (See *Bauer-Schweitzer Malting Co.* v. *City and County of San Francisco, supra,* 8 Cal.3d 942, 946.) There the court, after quoting from *Hickman, supra,* stated: "Under the constitutional provision and the decisions interpreting it (e.g., *Hickman*), uniform assessment is required; and the provision is effective without the enactment of any legislation and is therefore self-executing. [Citations.] By the terms of article I, section 22, the provisions of our Constitution 'are mandatory and prohibitory, unless by express words they are declared to be otherwise' (see *Sail'er Inn, Inc.* v. *Kirby,* 5 Cal.3d 1, 8 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351]), and there are no express words requiring otherwise with respect to former article XI, section 12. Under the circumstances, there is no merit to the contention made by plaintiff that express statutory authorization is necessary.

"In any event, however, statutory authorization for imposition of the escaped assessments existed. In 1966, section 401 of the Revenue and Taxation Code was amended to prescribe permissible assessment ratios for fiscal years commencing with the 1967-1968 fiscal year. (Stats. 1966, First Ex. Sess., ch. 147, p. 658.) But the escaped assessments here involved pertain to the years 1964, 1965, and 1966, as a result of which section 401, as it was in effect during such years, applies. The section then read, 'Except as provided in this part, all taxable property shall be assessed at its full cash value.' (Stats. 1939, ch. 154, p. 1285.) It was to the long, clearly established interpretation of the language of the predecessor statute of section 401 of the Revenue and Taxation Code (Pol. Code, § 3627) to which this court referred in pointing out in *Hickman* the

---

[13]As part of an extensive property tax reform in 1966 section 401 was rewritten to require assessors to assess within 20 and 25 percent of "full cash value" from the lien date for the 1967-1968 fiscal year through the lien date for the 1970-1971 fiscal year, and thereafter at 25 percent of its "full cash value." (Stats. 1966, First Ex. Sess., ch. 147, § 34, p. 658.) Other amendments in 1967 (Stats. 1967, ch. 43, § 1, p. 942, eff. Apr. 17, 1967), in 1968 (Stats. 1968, First Ex. Sess., ch. 1, § 10, p. 10, eff. Sept. 23, 1968), and in 1972 (Stats. 1972, ch. 1135, § 5, p. 2191) preserved the general tenor of the 1966 amendment. In 1974 (Stats. 1974, ch. 311, § 35, p. 603) the section was amended to read as present: "Every assessor shall assess all property subject to general property taxation at 25 percent of its full value."

special meaning with which the above mentioned constitutional provision was clothed and had to be interpreted; and that language was held to require uniform assessment. Consequently, in addition to the self-executing constitutional provision, there existed statutory authorization as well." (8 Cal.3d at pp. 946-947, fns. omitted. See also *Bret Harte Inn, Inc.* v. *City and County of San Francisco, supra,* 16 Cal.3d 14, 20-21; *De Luz Homes, Inc.* v. *County of San Diego* (1955) 45 Cal.2d 546, 562 [290 P.2d 544]; *Simms* v. *County of Los Angeles* (1950) 35 Cal.2d 303, 318 [217 P.2d 936]; *McClelland* v. *Board of Supervisors* (1947) 30 Cal.2d 124, 128-129 [180 P.2d 676]; *Rittersbacher* v. *Board of Supervisors* (1934) 220 Cal. 535, 544 [32 P.2d 135]; *Blinn Lbr. Co.* v. *County of Los Angeles* (1932) 216 Cal. 474, 482 [14 P.2d 512] [disapproved on other grounds *DeLuz Homes, Inc.* v. *County of San Diego, supra,* 45 Cal.2d 546, 570]; *Mahoney* v. *City of San Diego* (1926) 198 Cal. 388, 394-395 [245 P. 189]; *Birch* v. *County of Orange* (1921) 186 Cal. 736, 741 [200 P. 647]; *Southern Pac. Land Co.* v. *San Diego Co.* (1920) 183 Cal. 543, 545-546 [191 P. 931]; *Safeway Stores* v. *County of Alameda* (1975) 51 Cal.App.3d 783, 786 [124 Cal.Rptr. 503]; *Campbell Chain Co.* v. *County of Alameda* (1970) 12 Cal.App.3d 248, 253-254 [90 Cal.Rptr. 501]; *Glidden Company* v. *County of Alameda* (1970) 5 Cal.App.3d 371, 377-378 [85 Cal.Rptr. 88, 86 Cal.Rptr. 464]; *Knoff* v. *City etc. of San Francisco, supra,* 1 Cal.App.3d 184, 195-196; *Schwarz* v. *County of Marin* (1969) 271 Cal.App.2d 120, 122 [76 Cal.Rptr. 207]; and *Jones Lbr. Co.* v. *Del Norte County* (1967) 251 Cal.App.2d 645, 648 [59 Cal.Rptr. 644] [cert. den. (1967) 389 U.S. 1015 (19 L.Ed.2d 661, 88 S.Ct. 591)].)

In analyzing the cases last cited, and those referred to below on which the city relies, it is important to keep in mind that the assessment which is to be uniform is the product of two factors "full cash value" (now "full value") and the ratio of the assessed value to the former. Therefore, either a failure to properly appraise the full cash value or a failure to use a uniform ratio, or both, may produce the discrimination forbidden by the Constitution. By the same token compensating errors in appraisal of fair market value and in using an improper ratio may produce an assessment which is not discriminatory. In this case, with the exception of an objection to valuation appraisal methods by Lilli Ann which has been already noted, (see fn. 3 above), the taxpayers assume that the full cash value of business personal property has been properly appraised in making the escaped assessments (inventory at cost and equipment at 50 percent of cost), and has been assessed at the ratio of 50 percent proclaimed by the assessor. The principal claim is that all other taxable property has been assessed at a much lower proportion, either because

the assessor generally undervalued the full cash value of real property, or because he failed, despite his professed intent, to apply the same ratio as he did to business personal property. We, therefore, disregard those precedents which concentrate on errors in individual valuations or unequal ratios, and look to the cases where the complaining taxpayer's assessment has been demonstrated to be excessive because of the ultimate lower proportion of full cash value generally present in the taxing jurisdiction.

In *Simms* v. *County of Los Angeles, supra,* which is discussed below, the disparity in special assessment district charges resulted from the failure of the assessor to include fixtures of other than the protesting taxpayers in real property assessments. The court indicated the protestants should be relieved of that portion of the special assessment district charges levied against the assessed value of their fixtures. (35 Cal.2d at p. 318.)

In *McClelland* v. *Board of Supervisors, supra,* the court posed the questions as follows: ". . . [T]he chief contention of petitioner is that the alleged action of the assessor in making general substantial increases in the 1946 assessed valuations of multiple-dwelling properties and in failing to make such increases, except in a few isolated instances, against either one-family dwellings or against vacant lots, constituted an arbitrary and unlawful discrimination against the owners of multiple dwellings and brought about an unequal tax burden upon them." (30 Cal.2d at p. 128.) It quoted with approval from *Birch* v. *County of Orange, supra,* as follows: ". . . the taxpayer is entitled to . . . the exercise of good faith and fair consideration on the part of the taxing power in assessing his property, at the same rate and on the same basis of valuation as that applied to other property of like character and similarly situated. Inequality of taxation is produced as surely by inequality of valuation as by inequality of the rate of tax." (186 Cal. at p. 741, as found 30 Cal.2d at pp. 128-129.) Nevertheless, the court, on the taxpayers' petition for review of the order of the board of supervisors, sitting as a board of equalization, denying their application for a reduction of assessments, sustained that order because the factual decision of the board on the conflicting evidence before it could not be disturbed (30 Cal.2d at pp. 130-137).

In *Rittersbacher* v. *Board of Supervisors, supra,* the taxpayers sought review of a judgment denying their application for a writ of mandate to compel the board of equalization to cancel such portions of their

assessments as were erroneous. They claimed "that the assessor adopted a lower percentage in assessing certain classes of personal property than that applied to real estate and improvements, to the unlawful prejudice of and discrimination against the latter" (220 Cal. at p. 539), which is in the converse of the situation in this case. The case, other facets of which are discussed below, appears to support the city's position. The court affirmed the judgment for the board of equalization entered after a demurrer to the taxpayers' petitions for writ of mandate had been sustained because the assessor's report, an exhibit to the petitions, reflected "that there was no disparity between the assessment on the properties of the petitioners' and that placed on like property similarly situated."

The taxpayers rely principally on *Mahoney* v. *City of San Diego, supra.* There the court affirmed a judgment awarding the taxpayer a refund of taxes paid under a protest on real estate which was assessed at 80 to 100 percent of actual cash value, because the taxpayer showed that the assessor had uniformly assessed all taxable improvements on land at not to exceed 25 percent of their cash value. The court laid down the following principles: "[1] In the exercise of the foregoing powers and functions assessors, both by the general laws and by the charters of those municipalities in respect to the properties within which the duties of their officers are to be performed, are invested with a large measure of discretion in the exercise of their judgment as to the valuations to be placed for purposes of taxation upon the several kinds of such property subject to such taxation; and it has been generally held that when this judgment and discretion of assessing officers has been exercised, even though erroneously, within the limitations imposed by the foregoing provisions of the constitution and of the laws under which they operate, such judgment and discretion will not, as to the results reached by their exercise be interfered with by the courts in the absence of a showing of fraud or bad faith. [2] It is not, however, necessary that such fraud or bad faith on the part of the official shall be expressly shown; it may arise by implication out of the fact that the assessment when taken as a whole and viewed with respect to the assessable values of the various kinds of taxable properties within the province of his office discloses such a degree of discrimination between properties of the same class or properties of different classes as to clearly evince a wilful and systematic disregard of the requirements of the constitution and of the provisions of the statute or charter governing and limiting the exercise of the assessor's discretionary powers"; and "[3] The essential question with respect to the assessment of properties of the same or different classes to be determined

is as to whether the provisions of the constitution regarding uniformity in valuations and of the laws declaring how uniformity and equality in the distribution of the burdens of taxation are to be ascertained and applied have been fairly conformed to or systematically, and intentionally and grossly disregarded." (198 Cal. at pp. 396-397 and 398.)

In *Birch* v. *County of Orange, supra,* quoted in *McClelland* v. *Board of Supervisors, supra,* the court reversed a judgment of nonsuit which had denied the taxpayer the recovery of taxes paid under protest after the board of equalization failed to reduce the assessment of his oil lands, which was 10 to 15 times higher than the assessments on surrounding oil lands almost identical in character, development, production and value (186 Cal. at p. 738). Similarly, in *Southern Pac. Land Co.* v. *San Diego Co., supra,* the court reversed a judgment entered after a demurrer had been sustained to the taxpayer's complaint to recover taxes paid under protest (183 Cal. at p. 545). The complaint alleged the property was deliberately assessed at considerably more than its actual cash value, while all the property in the county was assessed systematically at not exceeding 25 percent of its actual cash value (*id.,* p. 544).

In *Safeway Stores* v. *County of Alameda, supra,* the issue was whether the assessed valuation of the taxpayer's property in connection with alleged escaped assessments for 1964, 1965 and 1966 was determined at a higher percentage of market value than the property of other taxpayers generally in Alameda County (51 Cal.App.3d at p. 785). The court affirmed a judgment awarding the taxpayer a refund of the taxes paid under protest. The court applied the following rule from *Schwarz* v. *County of Marin, supra,* "The test recognized by the law is a comparison of the ratio of the assessed valuations to the market valuations of the subject properties, on the one hand, with the ratio of the assessed valuations to the market valuations of *all of the taxable property of the county,* on the other." (271 Cal.App.2d at p. 122, as approved and applied 51 Cal.App.3d at p. 786. See also *Campbell Chain Co.* v. *County of Alameda, supra,* 12 Cal.App.3d 248, 254; *Glidden Company* v. *County of Alameda, supra,* 5 Cal.App.3d 371, 382; *A. F. Gilmore Co.* v. *County of Los Angeles* (1960) 186 Cal.App.2d 471, 476-477 [9 Cal.Rptr. 67]; *Birch* v. *County of Orange* (1927) 88 Cal.App. 82, 85-86 [262 P. 788]; and *Wild Goose C. Club* v. *County of Butte* (1922) 60 Cal.App. 339, 343 [212 P. 711])

The city rests its case on the theory that different tax burdens may be placed on different classes of property. It relies on statements such as

that found in *Simms* v. *County of Los Angeles, supra,* 35 Cal.2d 303, reading as follows: "Recovery of local taxes on the theory of discrimination by defendants could be had in these actions *only on proof* of the comparative tax burdens imposed by defendants on plaintiffs' property and *like property of others similarly situated. (Southern Cal. Tel. Co.* v. *Los Angeles County,* 45 Cal.App.2d 111 . . .)" (35 Cal.2d at p. 312, italics the city's.)[14] The statement, as indicated from the preceding text and a reading of the case cited in support, was directed to the principle that ". . . county or city levies cannot be shown to be discriminatory by proof of injury resulting from the act of a different and independent taxing authority." (*Id.,* and see 45 Cal.App.2d 111 at pp. 123-127 [113 P.2d 773].) Although the court found that the fixtures of others had been improperly classified as personal property it refused to give relief to the protesting taxpayers for general city and county taxes because there had been no discriminatory tax burden. It stated: "Where, as here, there is no claim or showing that real and personal property was assessed at a different proportion of value or that there was any difference in tax rate as between the two, no inquality of tax burdens would appear to result from the classification of bank vault doors and counterlines as realty and the concurrent classification of all similar property as personalty." (35 Cal.2d at p. 311.) On the other hand, with respect to special assessments levied against real property alone, the court ruled: ". . . [W]hen in the present cases the trial court concluded that with respect to the special assessment district charges the taxing authorities discriminated against plaintiffs by singling out banking fixtures for assessment as improve-

---

[14]See also: *Haman* v. *County of Humboldt* (1973) 8 Cal.3d 922, 928 [106 Cal.Rptr. 617, 506 P.2d 993] ["all vessels," and "all like taxpayers"]; *McClelland* v. *Board of Supervisors, supra,* 30 Cal.2d 124, 129 [" 'property of like character and similarly situated' "]; *Rittersbacher* v. *Board of Supervisors, supra,* 220 Cal. 535, 540 ["like property similarly situated"]; *Birch* v. *County of Orange, supra,* 186 Cal. 736, 741 ["of like character and similarly situated"]; *Southern Pac. Land Co.* v. *San Diego Co., supra,* 183 Cal. 543, 546 [" 'other property in the same class' "]; *Campbell Chain Co.* v. *County of Alameda, supra,* 12 Cal.App.3d 248, 252 [approved a determination by board of equalization "that the use of different ratios for different classes of property to arrive at assessed values was proper"]; *Glidden Company* v. *County of Alameda, supra,* 5 Cal.App.3d 371, 375 ["other similar property in the county"]; *Los Angeles Dodgers, Inc.* v. *County of Los Angeles* (1968) 260 Cal.App.2d 679, 683 [67 Cal.Rptr. 341] ["*similar* property"]; *Jones Lbr. Co.* v. *Del Norte County, supra,* 251 Cal.App.2d 645, 648 ["other property of like character and similarly situated"]; *Alberts* v. *Board of Supervisors* (1961) 193 Cal.App.2d 225, 232 [14 Cal.Rptr. 72] ["similar kinds of property"]; *Crothers* v. *County of Santa Cruz* (1957) 151 Cal.App.2d 219, 224 [311 P.2d 557] ["similar kinds of property of the same value"], and ["property . . . similar in character or situation"], page 225 ["property of like character and similarly situated"]; *County of Los Angeles* v. *Ransohoff* (1937) 24 Cal.App.2d 238, 241 [74 P.2d 828] ["like property of other merchants doing business in the same county"]; and *Hammond L. Co.* v. *County of Los Angeles* (1930) 104 Cal.App. 235, 240 [285 P. 896] ["property of like character and situation"].

ments and thereby subjecting them to special district taxes which were not levied upon like property of others similarly situated, it should have ordered the cases resubmitted to the board of equalization for determination of the value of plaintiffs' buildings without the included fixtures, . . ." (*Id.*, p. 318.)

The taxpayers point out that in many of the cases relied upon by the city (fn. 13 above), the court was not required or requested to make a comparison with the assessment ratio generally prevalent in the county and therefore reference to a comparison with property of the character similarly situated did not mean to preclude comparison with the general standard of assessment in the county. For example, in *Crothers* v. *County of Santa Cruz* (1957) 151 Cal.App.2d 219 [311 P.2d 557], the court observed: "As aptly pointed out by the court below, even conceding that the constitutional requirement of uniformity is not limited to property of like character, but that it includes all property within the general class of property subject to ad valorem taxes, it does not follow that the constitutional requirement was violated under the evidence introduced in. this case." (151 Cal.App.2d at p. 226.) They also distinguish between permissive variation in the methods used to ascertain the fair market value of different classes of property, and impermissive undervaluation which affects the ratio between true market value and the assessed value against which the uniform tax is levied. Nevertheless, all of the cases cited by the city cannot be so readily swept under the rug as involving procedural questions of burden of proof, limited judicial review or dicta.

In *Rittersbacher* v. *Board of Supervisors, supra,* the court approved a judgment entered after sustaining a demurrer to a complaint which alleged that the assessor adopted 50 percent of the market value of real property and of the depreciated value of the improvements thereon as the assessed values for real property and improvements, and 40 and 30 percent, respectively, on other types of property. (See 220 Cal. at p. 539.) In *Crothers* v. *County of Santa Cruz, supra,* the taxpayer unsuccessfully contended that he was discriminated against because 721 parcels of farm land were given favored treatment and assessed at 25 percent of fair market value while his urban property was assessed at 40 percent of such value (see 151 Cal.App.2d at p. 223). In *Jones Lbr. Co.* v. *Del Norte County, supra,* 251 Cal.App.2d 645, the court reversed a judgment in favor of a taxpayer who had obtained a refund of taxes on showing that owners of larger amounts of timberland were assessed at lower unit rates than his smaller holding. The court found that the assessor's discount

system was discriminatory, but denied the taxpayer relief, because a reduction of his assessment would only aggravate the discrimination between favored timberland owners and the holders of other property (see 251 Cal.App.2d at pp. 649-650). More recently in *Campbell Chain Co.* v. *County of Alameda, supra,* 12 Cal.App.3d 248, the taxpayers unsuccessfully contended that their business personal property and commercial real property were assessed at a higher ratio than was property generally in the county. It appeared that the assessor purportedly applied an assessment ratio of 40 percent to the full cash value of all classes of property but found that full cash value of commercial property at 70 percent of fair market value, of residential real property at 46 percent of fair market value, and of business personal property at 70 percent of cost. The court relied upon the rationale of *Rittersbacher* v. *Board of Supervisors.*[15]

It is impossible to reconcile these conflicting views without examining some of the principles upon which they are predicated. These principles and their development have been analyzed recently in *Bret Harte Inn,*

---

[15]In *Rittersbacher* the court stated, "It is the assessor's recognized duty to see that the valuation placed on the various kinds of property shall be in proportion to the worth of such properties. If it is proportional and all are treated alike, no one contends that the taxpayers must be charged a full hundred per cent, for such is not required by the law. It is also recognized that the assessment on personal property shall be on a basis which is fair to the owners of real property so that neither shall suffer to the advantage of the other.

"In dealing with the assessment of personal property the assessor is confronted with a difficult problem. In an endeavor to solve it he recognizes two general classes, viz.: 'Business personal property' and 'personal property.' The former refers to that class of personal property owned and used in manufacture, commerce and trade and the latter to that class of personal property which represents the personal belongings of individuals, usually in their homes. With reference to a stock in trade it is obviously impracticable if not impossible to take an inventory and evaluate each article. The inventories of stocks of merchandise reflected on the books of the company are taken as indicative of their worth. This inventory is discounted twenty per cent and then fifty per cent is applied for assessment purposes. It is not pointed out by the plaintiffs, nor does it appear how or in what manner the discount so applied is as a matter of law unreasonable or unlawful. Conceding that twenty per cent is an arbitrary figure, some discount would appear to be necessary and proper. Depreciation in value of merchandise which has remained upon the shelves must take place, as surely as depreciation of structures. Formerly the same percentage of depreciation was applied to machinery and equipment. But in recent years the replacement cost, which is deemed an important factor, has been found to decline steadily, the percentage of depreciation has been increased accordingly, and the fifty per cent of the value less this depreciation has been applied for assessment purposes. A dealer's inventory of new automobiles has been discounted twenty per cent and the remainder assessed on a basis of fifty per cent. Used automobiles, both in the hands of dealers and in use, are depreciated forty per cent on a basis of the cost price and the year of manufacture. This is likewise more or less arbitrary, but it must necessarily be so in order to attain a proper degree of uniformity." (220 Cal. at pp. 543-544.)

*Inc.* v. *City and County of San Francisco, supra,* as follows: "In passing upon various methods of valuation, the courts have shown an understandable reluctance to declare a particular method of valuation invalid under these provisions and thereby jeopardize a major portion of a county's assessment roll. (*Rittersbacher* v. *Board of Supervisors* (1934) 220 Cal. 535, 542 . . .) Consequently, they have presumed the regularity and correctness of the assessor's determinations [citations], and, since until recently the law has specified no particular method for determining full cash value, have recognized a wide discretion invested in the assessor to devise an appropriate scheme. [Citations.]

"The standard of review applied in the early cases challenging the valuation methods of the assessing authority was quite limited. Thus, in *Los Angeles etc. Co.* v. *County of L. A.* (1912) 162 Cal. 164 [121 P. 384, 9 A.L.R. 1277], the trial court had found that the extreme disparity between the valuation of plaintiff's property and that of his competitors' resulted from 'a design on the part of the assessor to discriminate against plaintiff, and the adoption and use by said assessor of an intentionally radical [*sic*] different method in arriving at the value of plaintiff's property from that used in all other cases . . . .' Nevertheless, the court, determining whether the assessment amounted to fraud or 'something equivalent to fraud in the making of the assessment, producing such effect,' held that the Board of Equalization's approval of the assessment cured any wrongdoing on the assessor's part even though the trial court had also found the board's approval 'merely perfunctory in character and hardly more than a mere form. . . .'

"In *Southern Pac. Land Co.* v. *San Diego Co.* (1920) 183 Cal. 543 . . . the court, citing *Los Angeles G. & Elec. Co., supra,* held that when a complaint alleged that the Board of Equalization approved an assessment in excess of the actual value of the plaintiff's land with knowledge that the assessor had assessed the rest of the county at less than 25 percent of true value, the complaint stated a cause of action and showed 'something equivalent to fraud.' In *Mahoney* v. *City of San Diego* (1926) 198 Cal. 388 . . . the trial court had found that the assessor assessed all land in the city at 80 to 100 percent of full cash value but assessed all improvements and personal property at 25 percent or less. The court affirmed a judgment for the plaintiff on the ground that the assessment pattern implied fraud or 'something equivalent to fraud.' In *Rittersbacher* v. *Board of Supervisors, supra,* 220 Cal. 535, the court refused to invalidate an elaborate assessment formula, citing *Mahoney, supra,* for the proposition that, in judging the assessor's methods, the courts will

consider only whether they constituted 'an arbitrary and wilful disregard of the law intended for his guidance' and were 'a constructive fraud upon [the plaintiffs].' (220 Cal. at p. 542.)

"More recently, however, the decisions have exhibited a trend towards less drastic requirements where aggrieved taxpayers have sought to set aside assessments. In *De Luz Homes, Inc.* v. *County of San Diego, supra,* 45 Cal.2d 546, 564, the court reinterpreted the 'something-equivalent-to-fraud' standard as allowing judicial review for 'arbitrariness, abuse of discretion, or failure to follow the standards prescribed by the Legislature,' and this standard now appears to have replaced the less specific constructive fraud standard of the *Mahoney* era. [Citations.]" (16 Cal.3d at pp. 21-23, fn. omitted.)

In the light of the foregoing analysis we find that the precedents relied upon by the taxpayers are controlling. ■ The fact that the escaped assessments equated the burden on the taxpayers' property with that of other owners of business personal property is of no avail if at the same time that class of property has been subjected to a discriminatory burden because of the general relationship of assessments to market value throughout the city as a whole.

In *Safeway* there was ample evidence to support the following findings: "[¶] IX . . . In the years 1964, 1965, and 1966, plaintiff was assessed on the average at ratios ranging from 37% to 47%, whereas residential real and personal property owners were assessed at much lower ratios, ranging on the average from 9% to 19%. Former Assessor Wolden favored residential property owners far more than he did plaintiff"; and "[¶] XX . . . [T]he only taxpayers in San Francisco who had been assessed in the years 1964, 1965, and 1966 at a 50% ratio were a portion of the business personal property taxpayers who represented approximately 5% of the total assessed value in the City, 15% of the taxpayers in the City, 20% of the total personal property assessed value, and 25% of the personal property taxpayers. . . ."; and "[¶] XXI . . . In the years 1964, 1965 and 1966, the vast majority of San Francisco taxpayers were not assessed at a 50% ratio, and were in fact assessed below the ratios at which plaintiff was originally assessed."

On the basis of those findings the court properly concluded, "[¶] V In each of the years 1964, 1965, and 1966, the same uniform assessment ratio was required by law to be applied to all taxable property in San Francisco. There was no legal authority for permitting a higher

assessment ratio to be applied to business personal property than to real property. Both are in the same 'class' for assessment ratio comparison purposes. . . ."

Similarly in Lilli Ann there was sufficient evidence to support similar findings, proposed by the taxpayer, which showed that there was discriminatory treatment in the assessments on which the tax originally paid was levied, and that the escaped assessments only increased the inequity.

In this part the assessment ratios established by the state board of equalization for 1964, 1965 and 1966 may be disregarded. Other evidence reflected that in 1967 the new assessor seriously attempted to assess all real property at 25 percent of its value. This produced a rise in the total assessed value of tangible property of approximately 25 percent. So if we take the full cash value (FCV) for 1967 and 1966, we obtain the anamolous formula that FCV (1967) $\times$ 25% = 125% $\times$ FCV (1966) $\times$ 50%, which in turn reduces to FCV (1967) = 250% FCV (1966). Since all the other evidence indicates that there was no such radical growth in market values in that short period, it is obvious that the fair cash value of all property was grossly undervalued in 1966, and in the preceding years. The discrepancy could not be explained by the alleged escaped assessments of personal property. Testimony indicated that there had been constant discrimination in favor of homeowners, and that the ratio of the assessments for real property were actually at a ratio of 19 percent of full cash value, rather than the 50 percent proclaimed by the former assessor.

The only things in the record to support the city's position are the alleged findings in *Knoff*, which, as we have seen are not binding on these taxpayers, and hearsay testimony concerning the professed ratio used by the assessor in connection with the assessments he made on real property. There is no substantial evidence to show that the original assessments against the taxpayers' property, as compared with the full cash value of that property as determined by audit, were not at a higher ratio than the ratio established by a comparison of the total assessed valuation of tangible property within the city to the actual full cash value of that property.

*Discrimination in Law*

■ As of October 6, 1966, former section 1605 of the Revenue and Taxation Code, which then[16] dealt with the authority of the local board of equalization to increase or lower assessments was amended to provide in pertinent part as follows: "... [¶] If after the determination of the full cash value of a parcel of property, the ratio of assessed to full cash value deviates by more than 15 percent from the latest preliminary or final ratio of assessment of all property in the county as found by the State Board of Equalization as provided in Article 1 (commencing with Section 1815) of Chapter 2 of this part, this shall be prima facie evidence of an inequitable assessment and the county board shall equalize the assessment on said property to the lower of: (a) an assessment based on the ratio established under Section 401; (b) an assessment based on 115 percent of the state board's latest preliminary or final ratio for the county; or (c) an assessment wherein the assessed value shall be in the same proportion to full cash value as all property in the county." (Stats. 1966, First Ex.Sess., ch. 147, § 71, p. 672.) By the enacting chapter the provisions of the section were to "first become operative for the 1967-68 assessment year" (*id.,* § 103, p. 683). " 'Assessment year' means the period beginning with a lien date and ending immediately prior to the succeeding lien date for taxes levied by the same agency." (Rev. & Tax. Code, § 118.) " 'Lien date' is the time when taxes for any fiscal year

---

[16]Section 1605 was again amended and recast, effective June 7, 1967, to read as follows in pertinent part: ". . . [¶] For the purpose of the equalization proceedings, it is conclusively presumed that the average ratio of assessed value to full cash value in the county is not more than 115 percent of the latest preliminary or final ratio determined by the board pursuant to Article 1 (commencing with Section 1815) of Chapter 2 of this part.

"The applicant for a reduction in an assessment on the local roll shall establish the full cash value of the property by independent evidence. The records of the assessor may be used as part of such evidence.

"The county board shall make a determination of the full cash value of each parcel for which an application for equalization is made. After determining the full cash value of a parcel of property, the county board shall establish the assessed value of the property at the lower of:

"(a) An amount equal to the property's full cash value, as determined by the county board, multiplied by the ratio established under Section 401.

"(b) An amount equal to the property's full cash value, as determined by the county board, multiplied by 115 percent of the board's preliminary or final ratio for the county.

"(c) An amount equal to the property's full cash value, as determined by the county board, multiplied by the ratio of assessed to full cash value of all property in the county, established without reference to the board's ratio for the county." (Stats. 1967, ch. 285, § 1, p. 1459; and see *id.,* § 3, p. 1460.)

In 1974 further amendments were made and the provisions were reenacted and renumbered in section 1610.8. (Stats. 1974, ch. 180, § 8, pp. 357-358, eff. Apr. 24, 1974, and ch. 311, § 48, pp. 611-612, eff. Jan. 1, 1975.)

become a lien on property." (*Id.,* § 117.) Prior to January 1, 1968, taxes became a lien on property as of noon "on the first Monday in March [Mar. 6, 1967] preceding the fiscal year for which the taxes are levied." (§ 2192, as amended by Stats. 1957, ch. 1861, § 1, p. 3263. Cf. Stats. 1967, ch. 818, § 5, p. 2244, operative Jan. 1, 1968, fixing time as "12:01 a.m. on the first day of March . . .")

Both taxpayers claimed that the provisions of section 1605, as originally enacted and as amended in 1967, applied to their claims for equalization. In the *Safeway* case the question was reserved, and in *Lilli Ann* the taxpayer's proposed findings on the subject were rejected. Lilli Ann concedes that if the state figures are used, there is a possible underassessment in 1966 which would justify an escaped assessment of $5,515.

The city contended that the provisions of the legislation relied upon could not be applied to escaped assessments for years prior to the 1967-1968 assessment year. (See *Campbell Chain Co. v. County of Alameda, supra,* 12 Cal.App.3d 248, 253, fn. 4; *Glidden Company v. County of Alameda, supra,* 5 Cal.App.3d 371, 377, fn. 3; and *Knoff v. City etc. of San Francisco, supra,* 1 Cal.App.3d 184, 195-196, fn. 9.) In *Knoff* the proceedings in the trial court leading to the original writ of mandate were concluded prior to the effective date of the 1966 statute (1 Cal.App.3d at p. 196, fn. 9). In *Glidden* the taxable years involved were 1963, 1964 and 1965, and the escaped assessment was made in February 1966 during the 1965-1966 assessment year. (5 Cal.App.3d at p. 375). *Glidden* does point out the relationship between the amendments to section 401 requiring the assessor to publicly announce an assessment ratio and the provisions added to section 1605 by the 1966 and 1967 legislation (*Id.,* p. 377, fn. 3). *Glidden* also notes that a discrepancy between the county ratio and the state ratio could not show discrimination in the absence of similar appraisals of full cash value. (*Id.,* pp. 379-381.) Here, however, the taxpayers seek to show by comparison of the ratios that there was a gross undervaluation of tangible property other than business personal property. *Campbell* was likewise a case of discriminatory ratios which did not involve the applicability of section 1605. The taxpayers were complaining of the manner in which the assessor computed "full cash value" from the appraised "fair market value" of different classes of property. (12 Cal.App.3d at p. 252.)

In *Safeway Stores v. County of Alameda, supra,* the question of the applicability of the provisions enacted in 1966 to subsequent escaped

assessments for years prior to the 1967-1968 assessment year was directly presented. The court concluded, "As shown above, the face of the statute makes it applicable to all equalization proceedings after March 6, 1967, regardless of date of the original assessment. The legislative committee report emphasizes this intent. The stressing of the merely 'procedural' nature of the amendment doubtless stems from the oversimplified but quite general view that retroactivity is rejected only as to 'substantive' changes in the law. Hence, it is reasonable to conclude that the Legislature intended the statute to apply to equalization of pre-1967 assessments even if the amendments were held technically retroactive." (51 Cal.App.3d at p. 788.)

The city seeks to avoid the consequences of the foregoing decision on several grounds. For the most part they are dependent on the applicability of the provisions of the *Knoff* mandate, and of the order of April 3, 1967, to the taxpayers involved in these proceedings. In the first part of this opinion it was demonstrated that these taxpayers were not bound by those proceedings, and that the city's reliance on the instructions issued in that case was misplaced with respect to taxpayers who were not parties to that proceeding and who could show that compliance with the writ would effect discriminatory treatment. Therefore, we conclude that despite the *Knoff* mandate, the taxpayers should have been entitled to an administrative hearing to determine whether application of the mandate would produce a discriminatory assessment in each individual case. We, therefore, reject the city's contention that under the *Knoff* mandate a San Francisco taxpayer, as distinguished from a taxpayer in any other county, can only secure review of an alleged discriminatory escaped assessment in court. Each taxpayer exhausted its administrative remedies by attempting to secure such a hearing, and relief if any had to be granted by the superior court. In fact in *Safeway's* case it was denied an extraordinary writ to secure such a hearing. (See *Safeway Stores* v. *Dolan*, 1 Civ. No. 25939, fn. 5 above.) If relief is to be granted it must be furnished directly by the courts, or if appropriate, by remand to the appropriate administrative body, be it the local tax appeals board, or the board of supervisors sitting as a board of equalization.

The point is only important because the city, after concluding that the taxpayers were only entitled to judicial, not administrative, relief in this matter, then asserts that since the superior court trials under review were not equalization hearings, the court could not consider the state ratios because the statute, as enacted and amended, is specifically addressed to the "county board." Since the *Knoff* mandate cannot deprive the

taxpayers of their right to equalization, the argument must fail. The trial court was entitled to consider the state-established ratios in each case. If it appears, as it did from uncontradicted evidence in each case, that the application of the legislative mandate in section 1605 would invalidate the escaped assessments, the court, as it did in *Safeway,* could award the taxpayer its refund without going through the idle act of referring the matter back to the "county board" which had erroneously denied a hearing, and, as it now has been found, also erroneously denied application of the state ratios.

Finally, the city contends that as so construed the statute is unconstitutional, because it violates the provisions governing the separation of legislative and judicial powers found in the California Constitution. (See art. III, § 3 [formerly § 1]; art. IV, § 1; art. VI, §§ 1, 4 and 10.) Here again the city attempts to give the *Knoff* mandate a scope unwarranted by the opinion which sustained it, or by the decisions which have construed it. Contrary to the city's position it would be unconstitutional for the judiciary to lay down standards for assessment practices which denied taxpayers, who were not parties to such proceedings, the rights conferred by state law.

The record in *Safeway* reflects that the point as made and reserved shows that the original assessments upon which taxes were levied and paid exceeded the ratio to full cash value permitted by section 1605. It follows that the escaped assessments were therefore invalid, and that the application of the statutory test is an alternative ground for affirming the judgment.

In *Lilli Ann* it is conceded that the application of the provisions of the section leaves a margin for an additional assessment in 1966. The case will have to be remanded for a determination of the proper full cash value of the personal property involved in the light of *Bret Harte Inn, Inc.* v. *City and County of San Francisco, supra,* and the application of the formula in section 1605 to that appraisal to determine the proper assessed value.

*Clean Hands*

In Lilli Ann's case the trial court found: "[¶] 9. In 1964 and 1965 plaintiff wilfully filed its property statements in blank (no figures), and

former assessor Wolden's deputy, Max Newstat, pencilled in some figures thereon (figures that resulted in plaintiff's inventories being assessed at a ratio of 26% of cost in 1964 and 18% of cost in 1965, and its equipment at 9.4% of cost in 1964 and 7.8% of cost in 1965). In 1966 plaintiff filed a property statement in which it wilfully failed accurately to set forth the cost of its tangible personal property and the amount of its solvent credits." It concluded, "[¶] 5. Plaintiff does not come into court with clean hands."

In Safeway's case the court found: "[¶] XXII In each of the years 1964, 1965, and 1966, plaintiff made a conscientious and generally accurate reporting of its personal property to the San Francisco Assessor. The major areas of difference between plaintiff and defendant's Assessor on audit involved matters of law and accounting on which reasonable men could differ. Deputy Assessor Wong testified at trial that the schedules introduced at trial by plaintiff, which showed that plaintiff inadvertently omitted to report 1.7% of its taxable property in San Francisco, were complete and accurate in all respects"; "[¶] XXIII There is no indication in the record of any illegal or improper conduct on the part of plaintiff or its agents. Although plaintiff is mentioned in the Wolden grand jury transcript, the reference is innocuous and establishes no impropriety attributable to plaintiff"; "[¶] XXIV It was not improper for plaintiff to retain a consulting firm for property tax assistance, and the record contains no indication that the firm which plaintiff retained was guilty of any improprieties"; and "[¶] XXV Plaintiff did not willfully conceal, remove, transfer, or misrepresent any property to evade taxation. Plaintiff's hands are clean." The court concluded, "[¶] VII Defendant failed to establish that plaintiff's hands were 'unclean'."

The thrust of the issue was twofold. The city asserted: "Actions to recover taxes paid under protest are equitable in nature. (*Steele* v. *San Luis Obispo County,* 152 Cal. 785 . . .; *H. & W. Pierce, Inc.* v. *Santa Barbara County,* 40 Cal.App. 302 . . .)" (*Simms* v. *County of Los Angeles, supra,* 35 Cal.2d 303, 316.) ■ As pointed out in *Simms* and the cases it cites, the recovery of taxes is governed by equitable considerations. The city, therefore, first claimed that each taxpayer should be denied any recovery because it had violated conscience, good faith or other equitable principle in its prior conduct. (See *Lynn* v. *Duckel* (1956) 46 Cal.2d 845, 850 [299 P.2d 236]; *De Garmo* v. *Goldman* (1942) 19 Cal.2d

755, 764 [123 P.2d 1]; and *Bowman* v. *Bowman* (1932) 125 Cal.App. 602, 612 [13 P.2d 1049, 14 P.2d 558].) Secondly, in each case the city claimed that assessments were properly imposed as penalty assessments in connection with the taxes on the escaped assessments, pursuant to the provisions of the Revenue and Taxation Code.[17]

These contentions have been rendered moot. In *Bret Harte Inn, Inc.* v. *City and County of San Francisco, supra,* the court considered a similar contention and ruled as follows: "It is further contended that plaintiff is not entitled to a refund of taxes levied under the 1967 escape assessment because it comes to court without clean hands, in that its 1964 and 1965 tax returns were submitted in blank and its 1966 return understated the amount of cash on hand. Even assuming, however, that these occurrences resulted in formal noncompliance with the requirements of the law governing the reporting of taxable assets, we do not believe that they were of such a character as to foreclose plaintiff from the relief it here seeks. All such deficiencies in plaintiff's property statements were remedied by subsequent audits by defendant, and there was no showing at trial of any improper motive. 'It is not every wrongful act, nor even every fraud, which prevents a suitor in equity from obtaining relief. His misconduct must be so intimately connected to the injury of another with the matter for which he seeks relief, as to make it inequitable to accord him such relief.' (*Bradley Co.* v. *Bradley* (1913) 165 Cal. 237, 242 [131 P. 750].)" (16 Cal.3d at pp. 27-28.) In the *Safeway* case, the city is faced with adverse findings which are sustained by sufficient evidence. In *Lilli Ann* the city has stated, "We-agree that *Bret Harte* nullifies the unclean hands defense."

---

[17]During the taxable years 1964, 1965 and 1966, sections 445, 501 and 503-505, provided as follows:

445. "The property statement shall show a description of personal property, in the detail required by the assessor. Except as to the household furnishings and personal effects of householders, such required detail may include the cost of the personal property if the information is within the knowledge of the assessee or is available to him from his own or other records." (Stats. 1959, ch. 1153, § 1, p. 3246.)

501. "After written demand by the assessor, if any person neglects or refuses to comply with any provision of law for obtaining information from taxpayers, the assessor may penally assess the property." (Stats. 1945, ch. 1045, § 1, p. 2034.)

503. "Any ·property, including intangibles, wilfully concealed, removed, transferred, or misrepresented by the owner or his agent to evade taxation, shall be penally assessed on discovery." (Stats. 1945, ch. 1045, § 2, p. 2034.)

504. "A penal assessment shall not exceed 10 times the value of the property penally assessed." (Stats. 1963, ch. 1947, § 1, p. 4012.)

505. "The assessor· shall make a penal assessment by entering on the· local roll opposite the name of the assessee the words 'Penal assessment.'" (Stats. 1945, ch. 1045, § 4, p. 2034.)

*Interest*

There remains for consideration Safeway's cross-appeal in which it seeks compound, rather than simple interest, on the amount of the taxes ordered to be refunded.

Section 5141 provides as follows: "If the court finds that the assessment complained of is void in whole or in part, it shall render judgment for the plaintiff for the amount of the taxes paid on so much of the assessment as is found to be void. In such event but only where taxes are paid after the effective date of this act, the plaintiff is entitled to interest on the taxes for which recovery is allowed at a rate per centum per annum equal to the rate per centum per annum that the defendant has received, through investment or by bank deposit, on the amount allowed and recovered as taxes from the date of payment under protest to the date of entry of judgment, and such accrued interest shall be included in the judgment. The taxes paid on so much of the assessment as is not found to be void shall constitute valid taxes which, if paid after delinquency, shall carry penalties, interest and costs." (Cf. fn. 6 above.)

The court awarded the taxpayer a figure which represents the simple interest which the city would have received on the amount of the taxes if deposited in the city's interest bearing account with a local bank, if the interest were paid to the city at regular six month intervals commencing August 31, 1967, and the city spent the interest. Safeway contends that since the evidence reflects that there was always on deposit a sum in excess of the protested taxes and accruing interest on that sum, the city in fact received the benefit of compound interest, and the taxpayer is entitled to that extra interest. Safeway construes the statute as requiring the city to pay to the successful protesting taxpayer all interest "that the defendant has received through investment or by bank deposit, on the amount allowed and recovered as taxes . . . ."

The statute does not so provide. It awards the successful protestant "interest on the taxes for which recovery is allowed *at a rate per centum per annum* equal to the rate per centum per annum that the defendant has received, . . ." Furthermore, as pointed out and applied in *State of California* v. *Day* (1946) 76 Cal.App.2d 536 [173 P.2d 399], "The general rule is that interest may not be computed on accrued interest unless by special statutory provision, or by stipulation of the parties, and in the latter event the amount may not be fixed in conflict with statutory provisions. [Citations.]" (76 Cal.App.2d at p. 554. See also *Estate of*

*Sharp* (1971) 18 Cal.App.3d 565, 584-588 [95 Cal.Rptr. 816]; and *Robertson* v. *Dodson* (1942) 54 Cal.App.2d 661, 665 [129 P.2d 726].)

In the absence of a legislative mandate to the contrary, we have no hesitancy in holding that the trial court properly limited Safeway's recovery to the recovery of simple interest computed at a rate determined by the statutory formula.

The judgment in favor of Safeway Stores, Incorporated, is affirmed with costs, with the exception of one-quarter of those incurred for its brief, to plaintiff.

The judgment in favor of the City and County of San Francisco and against Lilli Ann Corporation is reversed with directions to the trial court to amend its findings of fact and conclusions of law in accordance with the principles set forth above, to show the correct assessed value, if any, which escaped assessment in any of the taxable years in question.

Elkington, J., and Lazarus, J.,* concurred.

A petition for a rehearing was denied June 30, 1977, and the petition of the City and County of San Francisco for a hearing by the Supreme Court was denied August 11, 1977. Mosk, J., did not participate therein.

---

*Retired judge of the superior court sitting under assignment of the Chairman of the Judicial Council.